**TCI CABLEVISION OF NEW ENGLAND**

v.

**PIER HOUSE INN, INC., James S. Toro, and Anna Marie Toro.**

**No. 95–0494ML.**

United States District Court, District of Rhode Island.

July 15, 1996.

William F. Hague, Jr., Johnston, RI, for Plaintiff.

William M. Walsh, Providence, RI, for Defendants.

## MEMORANDUM AND ORDER

LISI, District Judge.

This matter was tried before the court sitting without a jury on April 17 and 18, 1996. At the court's request, the parties submitted post-trial memoranda concerning the applicability of 47 U.S.C. § 605 to this case. This matter is now in order for a decision on the merits.

## I. BACKGROUND

During the course of the trial, plaintiff TCI Cablevision of New England ("TCI") called seven witnesses. Five were current or former TCI employees: Lucien Marcoux, Paul Montella, Linda LaRue Carr, Ann Cartwright, and Stephen Frederich. The remaining two witnesses were the individual defendants in this case, James and Anna Marie Toro.[1] The defendants presented only one witness: James Toro. The court found all the witnesses, both for the plaintiff and the defendants, to be knowledgeable and credible. The following background facts are gleaned from the collective testimony of these witnesses and the exhibits introduced by both parties.

### A. TCI Cablevision of New England

Plaintiff TCI is a licensed provider of cable television service, with offices located throughout Rhode Island. TCI offers its customers the choice of two basic programming packages: (1) "limited basic," which consists solely of the VHF and UHF broadcast channels in the area; or, (2) "expanded basic," which includes the VHF and UHF broadcast channels as well as a certain number of stations available only via cable or satellite, e.g., the Cable News Network ("CNN"), Arts and Entertainment ("A & E"), or Turner Network Television ("TNT"). In addition, customers have the option of subscribing to a variety of "premium" channels, such as Home Box Office ("HBO") and the New England Sports Network ("NESN"), as well as a variety of pay-per-view events, including movies and sporting events.

TCI provides its cable programming through an intricate series of satellite dishes, microwave antennae, and coaxial cable locat-

---

1. During the course of testifying at trial, both James and Anna Marie Toro invoked the Fifth Amendment privilege against self-incrimination in response to certain questions, as they had during their depositions. It is well-settled that adverse inferences may be drawn from Fifth Amendment silence "where the privilege is claimed by a party to a civil cause." *Arthurs v. Stern,* 560 F.2d 477, 478 (1st Cir.1977), *cert. denied,* 434 U.S. 1034, 98 S.Ct. 768, 54 L.Ed.2d 782 (1978); *see also Baxter v. Palmigiano,* 425 U.S. 308, 318, 96 S.Ct. 1551, 1557–58, 47

L.Ed.2d 810 (1976); *LaSalle Bank Lake View v. Seguban,* 54 F.3d 387, 390 (7th Cir.1995); *Koester v. American Republic Inv., Inc.,* 11 F.3d 818, 823–24 (8th Cir.1993); *RAD Services, Inc. v. Aetna Casualty & Surety Co.,* 808 F.2d 271, 274 (3d Cir.1986). In this case, the court has drawn such adverse inferences with respect to the questions to which the Toros invoked their Fifth Amendment rights. The court is careful to note, however, that there exists sufficient evidence independent of the adverse inferences to find liability on the part of the defendants.

ed throughout Rhode Island. The starting point of much of the "cable" programming—as distinguished from available VHF and UHF broadcasts in the area, as well as "local access" programming produced by TCI—is Johnston, Rhode Island. There, at what is referred to as a "headend" facility, TCI has a number of antennae which receive cable programming signals from various satellites. The signals are then scrambled and transformed into microwave signals, which are transmitted to eight locations in Massachusetts and Rhode Island. The microwave signals are thereafter transmitted via coaxial cable to the localities that TCI serves.

In providing service to individual subscribers, both residential and commercial, TCI utilizes what is called an "addressable system." This means that TCI transmits scrambled signals for each of the fifty-six channels it offers to every customer. The signals are unscrambled at the subscriber's home or business by converter boxes that TCI provides to its customers. TCI controls the cable service provided to each subscriber through the use of "tier masks," which are located at TCI headquarters. A tier mask—which was referred to at trial as essentially amounting to an "on and off switch"—allows TCI to "talk" to its subscriber's converter box, thereby controlling how much of its signal a customer's converter box can unscramble. When a tier mask is "removed," cable service to a subscriber is terminated. This is done for a number of reasons, including, but not limited to, the failure to pay a bill.

TCI's ability to control the cable service it provides to its customers depends upon its ability to "talk" to a subscriber's individual converter box. Thus, TCI loses its ability to control the nature of the cable service provided to customers who are using "black boxes" or "pirate decoders," which allow the customers to unscramble all of the channels transmitted by TCI, including those not specifically subscribed to.

### B. *The Pier House Inn*

The corporate defendant, Pier House Inn, Inc., is a Rhode Island corporation owned by the individual defendants, James and Anna Marie Toro. The corporation operates the Pier House Inn ("Pier House"), a motel and inn located at 113 Ocean Road, Narragansett, Rhode Island. The Toros have operated the Pier House since 1985, albeit not with great financial success: tax returns for the years 1989–1993 indicate that Pier House Inn, Inc. did not enjoy a profit during any of those years.

Located approximately forty-seven feet from the Atlantic Ocean, the Pier House consists of two buildings. The main house, or inn ("inn"), is located at the front of the property and contains seven guest rooms, as well as a restaurant and lounge. The motel building ("motel") is located at the rear of the property and contains eighteen "motel-style" rooms. All of the rooms are apparently either ocean-front or ocean-view and are furnished with king-sized beds, color televisions, and telephones, and, according to Mr. Toro, are the largest accommodations in Narragansett.

Because of its proximity to the ocean, the Pier House is busiest during the summer months—specifically, between the Fourth of July and Labor Day weekend. It is during this time period that the Pier House takes in the majority of its yearly revenue. During the remainder of the year, the Pier House's revenues are substantially smaller, so much so that it significantly curtails its operations during this time.[2]

From 1989 to 1993, the Pier House was a "residential" customer of TCI, and was provided with two TCI converter boxes. It did not subscribe to TCI for commercial service. That is, it did not subscribe to provide cable television for any of its guest rooms. At the same time, however, the Pier House advertised, in a mailing to potential guests describing room rates and other general information about the Pier House, that it offered free movie channels via satellite. Further, in

---

**2.** The motel portion of the Pier House is closed in early November, following the later of either Parents' Weekend or Homecoming Weekend at the University of Rhode Island, which is located in nearby Kingston, Rhode Island. The Pier House is closed entirely in December and January, with the inn reopening in February, and the motel thereafter in April.

flyers available in the individual rooms and at the front desk, it advertised the fact that it offered free movies and CNN programming.

### C. Investigation of Cable Theft

In October 1992, TCI commenced an investigation into the alleged unauthorized interception and/or reception of its cable service at the Pier House. TCI thereafter rented rooms at the Pier House on two separate occasions in order to confirm its suspicions.

### 1. October 1992

On either October 1, or October 2, 1992, Marcoux, the security manager and commercial sales manager for TCI, telephoned the Pier House and made arrangements for a weekend stay. The woman with whom he spoke described the amenities of the inn, which she stated included a television set in each room and programming which included HBO, Cinemax, first-run movies, and any event scheduled for that evening, such as a boxing event.

Marcoux checked into the Pier House with his wife at around 4:00 p.m. on October 4, 1992, and was assigned to Room 34. Upon entering the room, Marcoux noticed that there was no converter box in the room. However, when Marcoux turned the television on, a movie he knew to be scheduled for broadcast on HBO at that time was showing on channel three. After the movie ended, the HBO logo was displayed on the television screen.

At approximately 7:30 p.m. that evening, the programming broadcast on channel three automatically changed to "Request," a pay-per-view cable television channel. Shortly thereafter, the movie "Fried Green Tomatoes" began. After watching the movie for a few minutes, Marcoux called the front desk and spoke to Mr. Toro. His purpose in doing so was to establish that "expanded basic" service was available. Marcoux told Mr. Toro that he wanted to watch a New England Patriots football game at 8:00 p.m., which was scheduled for broadcast on TNT. Mr. Toro told Marcoux he would put the game on and, shortly after 8:00 p.m., the programming on channel three switched to the game he had requested. Mr. Toro called Marcoux to confirm that the game was on

and that he was "all set." Marcoux watched the game and during time-outs observed two commercials for a local oil company which had been produced by TCI. According to Marcoux, the TCI commercials were produced and broadcast in-house—that is, they were not broadcast over VHF or UHF frequencies, and could only be seen while watching cable television programming supplied by TCI.

At some point in the evening, Marcoux telephoned Cartwright, who was working as a dispatcher for TCI that evening. Marcoux instructed her to remove the "tier mask" from both of the converter boxes assigned to the Pier House. As noted above, the removal of a "tier mask" ordinarily has the effect of shutting off the cable television signal to a subscriber. When Cartwright did as instructed, however, Marcoux observed that the cable programming in his room was not affected. This indicated to him that the cable television signals were not being routed through converter boxes issued to the Pier House by TCI.

The next morning, Marcoux met Montella, who was employed by TCI as a line technician, at the intersection of Boone and Rodman Streets in Narragansett. Marcoux instructed Montella to wait approximately ten minutes—enough time for Marcoux to return to his room at the Pier House—and then to disconnect the coaxial cable carrying TCI's cable television signals that ran from a nearby utility pole to the Pier House.

Marcoux thereafter returned to his room and began to watch CNN. At the time Montella was instructed to disconnect the coaxial cable, the television reception went to "snow," and continued as such for about five minutes. The purpose of this exercise was to determine whether the Pier House might somehow be receiving the cable stations using a satellite dish, one of which Marcoux observed on the Pier House premises. The fact that the television reception went to snow at the same time Montella disconnected the coaxial cable verified Marcoux's earlier conclusion that the television programming offered at the Pier House was from TCI and had been obtained using a "black box" or "pirate decoder."

Upon checking out of the Pier House later that day, Marcoux mentioned to Mr. Toro that he had lost reception of CNN for four to five minutes that morning. Mr. Toro responded that he had lost CNN also, but attributed it to problems that he experienced with reception when the Pier House's satellite dish was not properly aligned.

## 2. *March 1993*

At about 6:15 p.m. on March 25, 1993, Carr, who was employed as the Commercial Accounts Coordinator at TCI, checked into Room 35 at the Pier House. Upon her arrival, she spoke with Mr. Toro about a pamphlet (Plaintiff's Exhibit 2) which was placed on the front desk at the inn and which listed the availability of first-run movies. Mr. Toro told her that if she wanted to watch a particular movie, she should turn on the television when she arrived at her room and look at the electronic program guide ("EPG"). When Carr decided what programs she wanted to watch, she was to telephone him at the front desk and he would make arrangements to have those programs broadcast on her television.

When Carr arrived at her room, she turned on the television set and examined the EPG. She noticed that the TCI logo appeared at the top of the screen. The display of the TCI logo evidenced the fact that the cable channels were being broadcast at the Pier House via a TCI signal and not directly from a satellite. Carr thereafter telephoned the front desk and spoke to "Jay" (Mr. Toro), and told him she wanted to watch "Honeymoon in Vegas," a movie which, according to the EPG, was scheduled to be shown that evening. Shortly after completing the phone call, the programming that was being shown was automatically interrupted, and the television began to broadcast the channel on which "Honeymoon in Vegas" was scheduled to be shown. At that time, a movie entitled "A League of Their Own" was showing. At 7:00 p.m., "Honeymoon in Vegas" began. Both movies were scheduled as pay-per-view selections that evening.

At or around 7:30 p.m. that evening, Frederich, a line technician for TCI, removed a "cap plate" located on a utility pole near the Pier House. The removal of a cap plate apparently serves to interrupt TCI cable service to a subscriber. As pre-arranged, Frederich left the cap plate off for about five minutes. Around this same time, the television reception in Carr's room went to snow.

On April 14, 1993, Marcoux returned to the Pier House, identified himself to the Toros as a TCI employee, and asked to see the two TCI converter boxes that had previously been assigned to the Pier House. Mr. Toro initially gave only one converter box to Marcoux. That box had not been issued by TCI. Mr. Toro thereafter produced a second converter box, which had been issued by TCI. During this exchange, Mr. Toro denied that the Pier House offered pay-per-view movies; he told Marcoux that Pier House offered only HBO and other premium channels. The TCI converter box was later tested and found to be working properly. The other converter box Mr. Toro gave Marcoux was tested but found not to be compatible with the TCI system.

TCI terminated service to the Pier House on April 14, 1993. As noted above, the Pier House had been listed as a residential customer. As a commercial customer, the Pier House would have needed an individual converter box for each guest room at a cost of $6.95 per month prior to 1993, and $7.95 thereafter, for "expanded basic" service. For each premium channel, TCI's monthly per room rate would have been $5.00. TCI did not have a commercial rate for pay-per-view movies. However, it charged its residential customers $4.25 per movie. The rate for other special events, *e.g.*, boxing matches, would have been higher than the movie rate, as much as $19.00 per event or more. There were approximately 400 pay-per-view movies offered each month.

## II. DISCUSSION

TCI claims it is entitled to recover damages as provided by 47 U.S.C. § 605. In support of its contention, TCI relies on the recent decision by the Second Circuit in *International Cablevision, Inc. v. Sykes*, 75

F.3d 123 (2d Cir.1996).[3]  The defendants argue that TCI is entitled to damages pursuant only to 47 U.S.C. § 553, entitled "Unauthorized reception of cable service," if it successfully proves its case.  While the provisions mirror each other to the extent that each provides for both criminal penalties and private rights of action should they be violated, § 605 provides for a greater potential recovery of damages than § 553.  Moreover, § 605 permits prevailing plaintiffs to recover their costs and attorneys' fees as a matter of right, whereas prevailing parties under § 553 may recover such only if a trial judge issues such an order.

Because any award of damages in this case will depend upon which provision of Title 47 applies, it is incumbent upon this court to elucidate the facts it has found proven, and to examine the applicability of both § 553 and § 605 in light of those facts.

### A.  *Findings of Fact*

This court has found the following relevant facts:

1.  The television sets in Rooms 34 and 35 of the Pier House broadcast TCI's "expanded basic" cable programming, as well as HBO, and pay-per-view movies.

2.  Pier House intercepted TCI programming at a point where that programming was being transmitted via coaxial cable.

3.  Pier House was not authorized to receive or intercept HBO or pay-per-view movies from TCI and did not do so using a satellite dish.

4.  Pier House did not subscribe to TCI for its guest rooms and, therefore, cable television programming in those rooms was transmitted without authorization from TCI.

### B.  *47 U.S.C. § 553*

Section 553 provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law."  47 U.S.C. § 553(a)(1).  There is no dispute that the defendants would be subject to liability under § 553 based on the allegations advanced by TCI in this case.  Indeed, in light of the findings of fact that this court has made, liability pursuant to § 553 is clear.

Once liability is established pursuant to § 553, damages are to be calculated using either of two approaches provided in the statute.  First, "the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages...."  *Id.* at § 553(c)(3)(A)(i).  In seeking damages under this provision, a plaintiff is required only to prove the gross revenue of the defendant, which may be offset by the violator's "expenses and the elements of profit attributable to factors other than the violation...."  *Id.*  Second, a "party aggrieved may recover an award of statutory damages for all violations involved in the action, in a sum of not less than $250 or more than $10,000 as the court considers just."  *Id.* at § 553(c)(3)(A)(ii).

Regardless of the means by which damages are calculated, the trial court is given the authority to increase or decrease any amount to be awarded.  The "court in its discretion may increase the award of damages ... by an amount of not more than $50,000" should the court find that a violation

**3.**  This decision, hereafter referred to as *"Sykes II,"* represents that the second occasion the Second Circuit had to address the applicability of § 605 to facts similar to those in this case.  When the matter was originally tried in the district court, the court and the parties apparently assumed that §§ 553 and 605 both applied.  *See Sykes II,* 75 F.3d at 127.  In *Sykes I,* the Second Circuit observed that the applicability of § 605 was "unclear."  *See International Cablevision, Inc. v. Sykes,* 997 F.2d 998, 1007 (2d Cir.1993)

(*"Sykes I"*).  However, the court did not affirmatively decide the applicability issue.  Instead, it vacated and remanded the case for the district court to determine the applicability of that section, if the plaintiff still wished to pursue its claim under § 605.  *See id.* at 1009.  On remand, the district court concluded that § 605 did not apply to the interception of cable-borne television signals.  *See Sykes II,* 75 F.3d at 128–29.  The parties appealed, and the Second Circuit reversed the district court's decision in *Sykes II.*

was willful and for purposes of "commercial advantage or private financial gain. . . ." *Id.* at § 553(c)(3)(B). The court is entitled to decrease the damage award to a sum of not less than $100 in "any case where the court finds that the violator was not aware and had no reason to believe that his acts constituted a violation of this section. . . ." *Id.* at § 553(c)(3)(C).

Since there is no dispute regarding the applicability of § 553, this court turns forthwith to a discussion of the applicability of § 605.

### C. 47 U.S.C. § 605

The relevant provisions of § 605 prohibit the unauthorized interception or receipt of *radio* communications. *See* 47 U.S.C. § 605(a). "Radio communication" is defined earlier in the chapter as encompassing "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services . . . incidental to such transmission." 47 U.S.C. § 153(b). TCI argues that the defendants' actions in intercepting and/or receiving TCI cable signals violated the provisions of § 605(a) because the signals had been previously transmitted to TCI via radio from various satellites. Plaintiff's asseverations are understandable: as noted above, § 605 provides for a potentially greater damage award and mandatory attorneys' fees to a prevailing party.[4]

At the outset, this court notes that the First Circuit has not had the opportunity to decide whether theft of cable services at a point where the signal is transmitted via wire violates the provisions of § 605. Moreover, there is little case law outside of the First Circuit addressing this issue. As a result, TCI relies heavily on the Second Circuit's decision in *Sykes II* for support. The defen-

dants counter by asserting that, given the plain and ordinary meaning of the language used in § 605, it must be interpreted to prohibit the unauthorized interception or receipt of *radio* communications only.

■ This court begins by examining the rationale employed by the Second Circuit in *Sykes II*, and thereafter proceeds to look at the language and legislative history of § 605. For the reasons discussed below, this court concludes that the defendants' actions do not fall within the purview of § 605.

### 1. Sykes II

In *Sykes II*, the plaintiff, a company providing cable television service, sued two defendants who it alleged were selling "pirate" descramblers which enabled cable customers to receive premium channels from the plaintiff without paying for them. *See Sykes I,* 997 F.2d at 1000–01; *International Cablevision, Inc. v. Noel,* 859 F.Supp. 69, 71–72 (W.D.N.Y.1994). There, as here, the pivotal question was "whether the descramblers sold by [the defendants] were intended to be used to 'receive . . . any . . . communication by radio' within the meaning of the third sentence of § 605(a) . . .;" that is, whether § 605 applied to the interception of communications that originated as radio signals but had been converted to wire communications prior to interception. *Sykes II,* 75 F.3d at 129.

Citing to the legislative history of § 553 and the 1984 amendments to § 605, the Second Circuit answered that question in the affirmative. The court concluded that the

> continued transmission of radio signals via cable after their receipt at the headend of a cable television system can be regarded as the 'receipt, forwarding and delivery of [radio] communications . . . incidental to

---

4. Section 605 provides that damages awarded pursuant to that section may be computed in either of two ways as well:

(I) the party aggrieved may recover the actual damages suffered by him as a result of the violation and any profits of the violator that are attributable to the violation which are not taken into account in computing the actual damages; . . . or

(II) the party aggrieved may recover an award of statutory damages for each violation

. . . in a sum of not less than $1,000 or more than $10,000, as the court considers just. . . . 47 U.S.C. § 605(e)(3)(C)(i). Further, should the court find that a violation was "committed willfully and for purposes of direct or indirect commercial advantage or private financial gain, the court in its discretion may increase the award of damages, whether actual or statutory, by an amount of not more than $100,000 for each violation. . . ." 47 U.S.C. § 605(e)(3)(C)(ii).

[the transmission]' of the pictures and sounds transmitted by those communications within the meaning of § 153(b).

*Id.* at 131 (footnote omitted). In so doing, the court acknowledged that its expansive reading and application of § 605 relegates § 553 to prohibit the unauthorized receipt or interception solely of cable programming which does not originate as a radio communication. *See id.* at 131 n. 5. In essence, this interpretation would mean that only cable programming produced in-house would be protected by § 553.

This court finds that such an expansive interpretation of the reach of § 605, and concomitant restrictive application of § 553, is supported by neither the plain language employed in the respective statutes nor the legislative history behind either. The court examines each *seriatim.*

### 2. *Statutory Language*

■ This court begins with the "familiar canon of statutory construction that the starting point for interpreting a statute is the language of the statute itself." *Consumer Prod. Safety Comm'n v. GTE Sylvania, Inc.,* 447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980); *see also United States v. Ramirez–Ferrer,* 82 F.3d 1131, 1136 (1st Cir. 1996) (en banc). Indeed, "a statute ordinarily will be construed according to its plain meaning." *In re Thinking Machines Corp.,* 67 F.3d 1021, 1024–25 (1st Cir.1995). The "meaning, or 'plainness,' of discrete statutory language is to be gleaned from the statute *as a whole,* including its overall policy and purpose. 'Literal' interpretations which lead to absurd results are to be avoided." *Summit Inv. and Dev. Corp. v. Leroux,* 69 F.3d 608, 610 (1st Cir.1995) (citations omitted).

The proscriptive language found in § 605 is quite clear. The relevant statutory provision provides that "[n]o person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by *radio* and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a) (emphasis added). The plain language of this statute prohibits individuals from receiving,

or assisting others in receiving, *radio* communications without authorization to do so.

Thus, it is clear from the language of § 605 that it governs, *inter alia,* the unauthorized reception of cable television programming while it is being transmitted in radio form. The statute is silent as to the unauthorized reception of wire communications, or radio communications that have been converted to wire communications prior to their reception. Thus, § 605 would apply, for example, if an unauthorized individual used a satellite dish to intercept the signals that TCI first receives at its headend facility in Johnston, or the microwave signals that originate at the Johnston facility and are thereafter transmitted to various points in Rhode Island and Massachusetts.

Given its plain meaning, the language of § 553 clearly governs the unauthorized reception of cable television service transmitted via *wire.* The statute provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1). Section 553 proscribes, *inter alia,* the interception of cable television signals subsequent to their conversion from radio to wire communications. The prohibition extends to the use of the aforementioned "black boxes" or "pirate" descramblers, which intercept the signal as it passes through coaxial cable.

■ The scope of § 605 is limited to interdicting the interception of cable television signals while they are being transmitted via radio wave, while the provisions of § 553 prohibit the unauthorized interception of cable signals transmitted over wire. This interpretation is consistent with the basic canon of statutory construction which counsels that statutes must be read in harmony with one another so as not to render one nugatory or superfluous. *See United States v. Caldera–Herrera,* 930 F.2d 409, 411 (5th Cir. 1991).

Notwithstanding this court's interpretation of the relevant statutory language, this court acknowledges that TCI's argument in favor of a broad interpretation of § 605 does have

some plausible appeal. Indeed, at least one other court has described the interplay and overlap between the legislative histories of the two statutes as "complex and at times confounding." *Cablevision Systems Corp. v. Muneyyirci*, 876 F.Supp. 415, 420 (E.D.N.Y. 1994). Thus, in recognition of the principle that when "Congress' words admit of more than one reasonable interpretation," *In re Thinking Machines Corp.*, 67 F.3d at 1025, or when the legislature has "blown an uncertain trumpet," *Sullivan v. C.I.A.*, 992 F.2d 1249, 1252 (1st Cir.1993), an inquiring court must look to the policies, principles, and purposes underlying the statute in order to construe it, this court proceeds to examine the relevant legislative history of the two statutes. *See In re Thinking Machines Corp.*, 67 F.3d at 1025.

### 3. *Legislative History*

In 1984, Congress amended the Communications Act of 1934 by adding one new section, entitled "Cable Communications" and currently codified at 47 U.S.C. §§ 521–559, and recodifying and amending a second, which is currently codified at 47 U.S.C. § 605. In enacting these amendments, the Energy and Commerce Committee ("Committee") of the House of Representatives acknowledged that the Communications Act of 1934 "was enacted well before the advent of cable television" and that, "[a]s a result, there [had] never been a national policy to guide the development of cable television." CABLE COMMUNICATIONS POLICY ACT OF 1984, H.R.REP. NO. 98–934, 98th Cong., 2d Sess. 40 (1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4677. The Cable Communications section sets forth a comprehensive scheme for the regulation of the cable industry that is consistent with Congressional intent that the legislation "encourage the growth and development of cable systems, ... assure that cable systems are responsive to the needs and interests of the local communities they serve ... [and] assure that cable systems provide the widest possible diversity of information services and sources to the public." *Id.*

A vital component of this scheme was § 634, entitled "Unauthorized reception of cable services," which was ultimately codified

at 47 U.S.C. § 553. This section was enacted because the Committee was "extremely concerned with a problem which [was] increasingly plaguing the cable industry—the theft of cable service." *Id.* at 4720. Indeed, the Committee noted that the theft of cable service was depriving the cable industry of millions of dollars of revenue every year. *See id.*

In incorporating this section into the scheme, the Committee acknowledged the existence of § 605 and the fact that it "include[d] a prohibition against the unauthorized reception of communications services." *Id.* The Committee stated that "[n]othing in [§ 553] is intended to affect the applicability of existing section 605 to theft of cable service, or any other remedies available under existing law for theft of service." *Id.* The Committee went on to refine its explanation by delineating the precise conduct which would be governed by each statute:

> The Committee intends the phrase 'service offered over a cable system' to limit the applicability of [§ 553] to theft of a service from the point at which it is actually being distributed over a cable system. *Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology) but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*

*Id.* (emphasis added).

From this passage, it is clear that Congress intended § 553 to apply to the interception or receipt of cable service transmissions at the point in the system that the transmission is carried by coaxial cable or wire. For the more "sophisticated" pirates—*i.e.*, those who intercept cable television signals before they begin to travel through the cable—Congress intended for § 605 to continue to apply.

The legislative history of the amendments to § 605 also supports this interpretation. Senator Packwood noted that the amendments were designed to deal with the "growing practice of individuals taking down satel-

lite delivered programming for private, home viewing by means of privately owned backyard earth stations, as well as the increasing need to adopt stronger penalties and remedies for the unauthorized interception of signals prohibited under section 605." STATEMENT OF SENATOR ROBERT W. PACKWOOD, CHAIRMAN OF THE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION, ON THE HOUSE AMENDMENTS TO S. 66, 130 CONG.REC. S14286 (Oct. 11, 1984), *reprinted in* 1984 U.S.C.C.A.N. 4655, 4745. This court believes that this passage points to an intent on the part of Congress that § 605 would cover those transgressions involving the theft of cable television signals directly from a satellite.

The Second Circuit focused on a different portion of Senator Packwood's statement, however, in arriving at its conclusion in *Sykes II.* That court emphasized statements made with respect to the impact that the amendments to § 605 would have on existing case law. *See Sykes II,* 75 F.3d at 132. Senator Packwood stated that the amendments and recodification of § 605 were intended to "leave undisturbed the case law that has developed confirming the broad reach of section 605 as a deterrent against piracy of protected communications." STATEMENT OF SENATOR ROBERT W. PACKWOOD, CHAIRMAN OF THE COMMITTEE ON COMMERCE, SCIENCE, AND TRANSPORTATION, ON THE HOUSE AMENDMENTS TO S. 66, 130 CONG.REC. S14286 (Oct. 11, 1984), *reprinted in* 1984 U.S.C.C.A.N. at 4746. Indeed, the Senator noted that

> [o]ver the years federal courts, consistent with congressional intent, have recognized that section 605 provided broad protection against the unauthorized interception of various forms of *radio communications.* It is the Committee's intention that the amendment preserve these broad protections; that all acts which presently constitute a violation of present section 605 shall continue to be unlawful under that section as amended....

*Id.* (emphasis added).

The Second Circuit found that this language evidenced an intent on the part of

Congress for § 605 to continue to apply to the interception of cable signals that once originated via radio wave, regardless of the form of the signals at the time of interception. *See Sykes II,* 75 F.3d at 132–33. This court disagrees.

It is significant to this court that Senator Packwood did not point to a particular case or cases in making the statement. The Second Circuit's reliance on this phrase, particularly in light of both the specific reference to radio communications and the explanation of the relationship between §§ 553 and 605 found in the Committee's report that accompanied § 553, appears to assume that Congress had in mind the handful of cases cited by the Second Circuit. A close reading of the cases cited in *Sykes II* reveals, however, that the issues raised varied in several important respects from those raised in both *Sykes II* and in this case. *See, e.g., Cablevision v. Annasonic Electronic Supply,* No. CV–83–5159, 1984 WL 254933 (E.D.N.Y. Feb. 10, 1984) (unpublished decision interpreting first sentence of § 605); *Porter County Cable Co. v. Moyer,* 624 F.Supp. 1 (N.D.Ind.1983) (unopposed motion for summary judgment).

This court is persuaded by the Seventh Circuit's detailed historical analysis and sound interpretation of the legislative histories of §§ 553 and 605 in its July 3, 1996 decision in *United States v. Norris,* 88 F.3d 462 (7th Cir.1996). In *Norris,* the court addressed the reach of § 605 in the context of a criminal case: the defendant had been charged with wire and mail fraud, as well as with selling "black boxes" capable of descrambling coaxial cable transmissions, in violation of 47 U.S.C. § 605(e)(4).[5] *Id.* at 463. Specifically, it reviewed a district court order dismissing the § 605 counts on the grounds that the criminal provisions contained in § 553, and not those in § 605, applied to the conduct in question. *See id.*

On appeal, the government argued "that the nature of cable television programming

---

**5.** This section criminalizes the facilitation of any conduct prohibited under § 605(a). *See* 47

U.S.C. § 605(e).

distribution causes cable transmissions to fall within the definition of radio communication rather than wire communication." *Id.* at 466. It averred that "because part of the entire passage of cable television programming from programmer to consumer is through the air, cable television transmissions cannot be considered wire communications." *Id.* at 467. Rather, it argued that "a local cable provider's retransmission of cable programming over a cable network is merely 'receipt, forwarding, and delivery' that is 'incidental' to the original radio transmission and that it is therefore a 'radio communication.'" *Id.* at 467.

Both the district court and the Seventh Circuit rejected the government's argument. The Seventh Circuit stated that the interpretation urged by the government rendered the 1968 Omnibus Crime Act's regulatory scheme "meaningless," and the enactment of § 553 "superfluous." *Id.* at 467.[6] "If Congress had intended § 605 to govern the interception of cable television programming offered over a cable network, it would have had no reason to enact § 553." *Id.* Instead, the court held that "cable television programming transmitted over a cable network is not a 'radio communication' ... and thus its unlawful interception must be prosecuted under § 553(a) and not § 605." *Id.* at 469.

Moreover, the court rejected the government's attempt to rely on *Sykes II* as support for its proposition. Referring to the Second Circuit's reliance on the pre–1984 district court cases in reaching its conclusion, the *Norris* court opined that the "fatal difficulty with the Second Circuit's analysis ... is that it plucks one sentence of § 553(a)'s legislative history out of context and assigns that sentence a meaning completely at odds with the context." *Id.* at 468. The *Norris* court found the only plausible and consistent interpretation of the entire legislative history was "that Congress intended for § 605 to apply to the unlawful interception of cable programming transmitted through the air, while it intended for § 553 to apply to the unlawful interception of cable programming

while it is actually being transmitted over a cable system." *Id.* at 466. This court finds the Seventh Circuit's holding both legally sound and logically compelling.

For the reasons stated, this court holds that the defendants' conduct is a violation of 47 U.S.C. § 553, but is not a violation of 47 U.S.C. § 605(a).

### III. DAMAGES

Under the provisions of § 553(c)(3)(A), this court may award TCI either actual or statutory damages. *See* 47 U.S.C. § 553(c)(3)(A). In this case, TCI seeks an award of actual damages based on its proffered calculations of loss suffered by the defendants' failure to pay subscription rates and pay-per-view rates for its 25 guest rooms from 1989 to 1993. TCI, however, has failed to prove the components necessary to arrive at an actual damage figure. Accordingly, this court will award statutory damages pursuant to § 553(c)(3)(A)(ii) in the amount of $5,000 for the violations involved in this action.

Plaintiff also seeks a damage enhancement pursuant to § 553(c)(3)(B). This court finds that the defendants committed the violations willfully and for the purposes of commercial advantage. In support of this finding, the court takes into account the Pier House's advertisements, which blatantly offered its guests free CNN and first-run movies. This amenity certainly enhanced the Pier House's attractiveness and undoubtedly was offered by the Pier House for commercial advantage in competing for guests during the brief "busy season." Therefore, the court increases the award of damages by $5,000.

Finally, TCI has submitted an affidavit in support of its request for costs and attorneys' fees. Under § 553(c)(2)(C), this court has discretion to award costs and fees to a prevailing party. Having found the defendants in violation of § 553(a), the court awards TCI its costs of $507.48 and the sum of $10,000 as reasonable attorneys' fees.

---

**6.** The 1968 Omnibus Crime Control and Safe Streets Act "amended what is now § 605(a) to remove reference to wire communications from all but the first clause," and "included sweeping laws governing the interception of wire and oral communications," which are codified beginning at 18 U.S.C. § 2510. *United States v. Norris,* 88 F.3d at 464.

## IV. CONCLUSION

Therefore, judgment shall enter in favor of TCI in the amount of $20,507.48.

SO ORDERED.