### JOE HAND PROMOTIONS, INC.

v.

### RENNARD STREET ENTERPRISES, INC., et al.

**Civil Action No. 96–3593.**

United States District Court, E.D. Pennsylvania.

Jan. 29, 1997.

As Amended April 2, 1997.

Alan Gelb, Cherry Hill, NJ, for Joe Hand Promotions.

Robert C. Keller, Robert C. Keller and Associates, Upper Darby, PA, for Galway's Pub., Ltd., David Galway, Wilhelmina Galway, Ralph Ziegler.

Peter A. Lennon, Broomall, PA, for Lennon's Bar, Inc., James Lennon and Gloria Lennon.

### MEMORANDUM AND ORDER

HUTTON, District Judge.

Presently before this Court is the Motion of Defendants Lennon's Bar, Inc., James Lennon, and Gloria Lennon to Dismiss the Plaintiff's Complaint for Failure to State a Claim Upon Which Relief May be Granted.

### I. BACKGROUND

The plaintiff, Joe Hand Promotions, Inc., was granted the right to distribute a championship prize-fight boxing match broadcast nationwide on June 17, 1995, via closed circuit television.[1] The plaintiff entered into agreements with various entities in Pennsyl-

---

1. The plaintiff does not identify the prizefight or    explain how the broadcast was distributed, i.e.

vania to publicly exhibit the boxing match to their patrons.

The plaintiff claims that on June 17, 1995, eighteen defendants [2] exhibited the boxing match at the time of its transmission even though they had not paid the required subscription fee. Therefore, on May 9, 1996, the plaintiff filed suit against these defendants in this Court, alleging that the defendants violated 47 U.S.C. § 605 by exhibiting the prizefight, without authorization. In addition, the plaintiff alleges claims of conversion and interference with prospective economic advantage.

On July 19, 1996, three of the defendants, Lennon's Bar, Inc., James Lennon, and Gloria Lennon (collectively "the defendants"), responded by filing the instant motion to dismiss. In their motion, the defendants argue that the plaintiff's complaint must be dismissed because it fails to allege facts sufficient to plead a cause of action pursuant to 47 U.S.C. § 605. Additionally, they assert that the plaintiff lacks standing to bring the instant suit under 47 U.S.C. § 605. They also urge for the dismissal of the state law allegations, arguing that there is no reasonable basis for the Court to exercise supplemental jurisdiction.

## II. *DISCUSSION*

### A. *Standard for Dismissal under Rule 12(b)(6)*

■ Federal Rule of Civil Procedure 8(a) requires that a plaintiff's complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief...." Fed.R.Civ.P. 8(a)(2). Accordingly, the plaintiff does not have to "set out *in detail* the facts upon which he bases his claim." *Conley v. Gibson*, 355 U.S. 41, 47, 78 S.Ct. 99, 103, 2 L.Ed.2d 80 (1957) (emphasis added). In other words, the plaintiff need only to "give the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Id.* (emphasis added).

■ When considering a motion to dismiss a complaint for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6),[3] this Court must "accept as true the facts alleged in the complaint and all reasonable inferences that can be drawn from them. Dismissal under Rule 12(b)(6) ... is limited to those instances where it is certain that no relief could be granted under any set of facts that could be proved." *Markowitz v. Northeast Land Co.*, 906 F.2d 100, 103 (3d Cir. 1990) (citing *Ransom v. Marrazzo*, 848 F.2d 398, 401 (3d Cir.1988)); *see H.J. Inc. v. Northwestern Bell Tel. Co.*, 492 U.S. 229, 249–50, 109 S.Ct. 2893, 2905–06, 106 L.Ed.2d 195 (1989). The court will only dismiss the complaint if " 'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations.' " *H.J. Inc.*, 492 U.S. at 249–50, 109 S.Ct. at 2906 (quoting *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232–33, 81 L.Ed.2d 59 (1984)).

cable, microwave, or satellite transmission. The defendants, however, assert that the boxing match was the Las Vegas heavyweight bout between Riddick Bowe and Jorge Luis Gonzalez, which was broadcast on Home Box Office ("HBO") via local cable television companies. (Defs.' Mem. at 2.) Although the plaintiff does not confirm this assertion, it does admit in its response to the defendants' motion that the fight was broadcast on HBO. (Pls.' Resp. at 2.) (entitling heading "1. Plaintiff Sates a Cause of Action and Has Standing to Sue Movants for an Unauthorized Broadcast of HBO".)

**2.** The defendants are Rennard Street Enterprises, Inc., Thomas J. Broccardi, George A. Iannaconi, Jr., Galway's Pub, Ltd., David Galway, Wilhelmina Galway, Lennon's Bar, Inc., James Lennon, Gloria C. Lennon, Phinny Magee's Pub, Inc., James J. Magee, Alex Phinn, Ralph Ziegler T/A Blue Room, Ralph Ziegler, John W. Fitton,

Jr., Mary Jane Freed, Gino T. Strippoli, and Rosemarie Strippoli. On July 19, 1996, however, the plaintiff dismissed its claims against defendants Phinney Magee's Pub, Inc., James J. Magee, and Alex Phinn. (Stipulation of Dismissal of 7/19/96, Docket No. 6.) Furthermore, on December 19, 1996, this Court granted the plaintiff's motions for default judgment and entered judgment against Defendants Rennard Street Enterprises, Inc., Broccardi, and Fitton. (Orders of 12/19/96, Docket Nos. 16, 17, & 18.)

**3.** Rule 12(b)(6) provides that:

Every defense, in law or fact, to a claim for relief in any pleading ... shall be asserted in the responsive pleading thereto if one is require, except that the following defenses may at the option of the pleader be made by motion: ... (6) failure to state a claim upon which relief can be granted....
Fed.R.Civ.P. 12(b)(6).

## B. *Analysis of Plaintiff's Claims*

### 1. *47 U.S.C. § 605 Claim*

The defendants argue that the plaintiff's claims under 47 U.S.C. § 605 must be dismissed because the allegations are not pled in sufficient detail to put the defendants on notice as to the specific actions alleged to have given rise to the cause of action. Moreover, they assert that even if the plaintiff's complaint is pled in sufficient detail, the claim must be dismissed because 47 U.S.C. § 553 and not 47 U.S.C. § 605 applies to the interception and reception of a television broadcast transmitted directly by coaxial cable. The plaintiff rejects these arguments and maintains that its complaint is sufficiently pled, arguing that 47 U.S.C. § 605 applies to the direct reception of cable television signals.

To resolve this controversy, this Court will first examine 47 U.S.C. §§ 553 and 605 to determine which section applies to the interception or reception of a television broadcast transmitted directly by coaxial cable. Following this determination, the Court will analyze the sufficiency of the plaintiff's allegations. If the plaintiff's allegations are sufficiently pled, then this Court will examine whether the plaintiff has standing to sue under 47 U.S.C. § 605.

### a. *Analysis of 47 U.S.C. §§ 553 and 605*

To understand the issue at the heart of the instant controversy, it is helpful to first review the mechanics of the cable television industry. Television signals are transmitted in one of two ways: either through the air or over coaxial cable.[4] Television, whose signals are transmitted through the air is referred to as broadcast television, while television whose signals are transmitted over coaxial cable is referred to as cable television. Nevertheless, because of advances in technology, the distinctions between cable and broadcast television are becoming increasingly blurred. This overlap of technologies is due primarily to the role of commercial communication satellites in the television industry:

> Communications satellites are fundamental to the distribution of television and cable transmissions. Satellite programmers sell their programming at wholesale rates to distributors, including cable companies. A cable company receives these signals at the cable system control center (the "head-end"), and processes and retransmits the signals over coaxial cable to subscribers using closed circuit radio frequency transmissions.

*United States v. Norris*, 833 F.Supp. 1392, 1394 (N.D.Ind.1993), *aff'd* 34 F.3d 530 (7th Cir.1994). Therefore, frequently a cable program is not a "pure" cable broadcast but is instead a hybrid broadcast, utilizing both broadcast and cable television technologies.[5] The problem with utilizing this hybrid approach, however, is that it gives non-subscribers two opportunities to intercept the cable broadcast. The non-subscriber may either intercept the cable broadcast from the satellite transmission to the cable system control center (the "headend")[6] or from the

---

4. Transmitting signals through the air and transmitting signals through a coaxial cable are equivalent in electronic terms. The same kind of electromagnetic field is transmitted and both types of transmission are manifestations of the working of precisely the same set of physical laws (Maxwell's equations). In the case of a transmission over the air, an electromagnetic field is radiated from the transmitter antenna. In the case of a transmission by coaxial cable, an electromagnetic field is formed within the space in the cable between the metal conducting elements of the cable and is propagated along the cable in that interior space. Only the boundary conditions are different in the two cases. If the outer sheath of the cable were removed, the electromagnetic field would propagate in all directions through the air and there would be a lowpower telecast.

*United Artists Television, Inc. v. Fortnightly Corp.*, 255 F.Supp. 177, 196 (S.D.N.Y.1966).

5. Of course, the transmission of an in-house cable program would still be a "pure" cable broadcast, because the television signal never travels through the air, but only over the coaxial cable network.

6. Satellite programs are also sold directly to private viewers or commercial establishments at retail rates. In 1986, satellite programmers began to scramble or encrypt their signals to protect themselves from the theft of their services. A person receiving the signal would need equipment to descramble or decrypt the signal to make use of the signal.

*Norris*, 833 F.Supp. at 1394.

retransmission to subscribers over the actual coaxial cable network.[7] In either case, the non-subscriber is able to enjoy and use an cable service for which he did not pay.[8]

To deter this unauthorized activity, Congress enacted 47 U.S.C. § 553 and 605. Section 553 was enacted thirteen years ago, as part of the Cable Communications Policy Act of 1984, specifically to remedy "a problem which was increasingly plaguing the cable industry—theft of cable services...." *Id.* (quoting H.R.Rep. No. 934, 98th Cong., 2d Sess., 83, *reprinted in* 1984 U.S.C.C.A.N. 4720). This section provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise by specifically authorized by law." 47 U.S.C. § 553(a) (1991). In other words, any person who intercepts a television broadcast intended to be distributed over a system of coaxial cables, may be held liable under Section 553.

Section 605, on the other hand, was enacted over sixty years ago, as part of the Communications Bill of 1934, to prevent the pirating of radio and wire communications. *United States v. Norris,* 88 F.3d 462, 465 (7th Cir.1996). Congress sought to prohibit certain types of unauthorized activities, which are set forth in the first four sentences of Section 605(a). The first sentence of Section 605(a) prohibits persons involved in the communications industry from divulging or publishing wire or radio communications:

Except as authorized ... no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by wire or radio shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers or various communication centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpena [sic] issued by a court of competent jurisdiction, or (6) on demand of other lawful authority.

47 U.S.C. § 605(a) (1991). The second sentence of this section prohibits any person from intercepting a radio communication and then divulging or publishing that communication:

No person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person.

*Id.* The third sentence prohibits any person from receiving a radio communication and using it for his own benefit or for the benefit of another:

No person not being entitled thereto shall receive or assist in receiving any interstate

7. A cable television subscriber receives basic cable service, which includes local broadcasts and other programming, for a monthly fee. The subscriber generally is provided a converter box which allows the subscriber to view only those channels for which he pays a monthly fee. The subscriber must pay an additional monthly fee to view premium channels, such as HBO, Showtime, and Cinemax. To prevent the interception of these premium channels, the cable companies transmit premium programming to subscribers in an encrypted form, and furnish the paying subscriber with a descrambler to decode the encrypted transmission. A subscriber who acquires a descrambler from a source other than the cable company can access premium programming without paying the cable company the additional monthly fee.

*Norris,* 833 F.Supp. at 1394.

8. The House Report accompanying the Cable Communications Policy Act of 1984 noted that:

Theft of service is depriving the cable industry of millions of dollars of revenue each year which it should otherwise be receiving. The Committee believes that theft of cable service poses a major threat to the economic viability of cable operators and cable programmers, and creates unfair burdens on cable subscribers who are forced to subsidize the benefits that other individuals are getting by receiving cable service without paying for it.

H.R.Rep. No. 934 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720.

or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

*Id.* Finally, the fourth sentence of Section 605(a) prohibits any person from learning the contents of an intercepted radio communication and using that information for his own benefit, or the benefit of another person:

No person having received any intercepted radio communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

*Id.*

■ An analysis of these prohibitions reveals two important observations, which are relevant to the instant dispute. The first observation is that although any person may violate the prohibitions of the second, third, and fourth sentences of Section 605(a), only legitimate communication personnel may violate the prohibitions of the first sentence. *General Instrument Corp. of Del. v. Nu–Tek Elecs. & Mfg., Inc.,* No. CIV.A.93–3854, 1996 WL 402511, at *3–4 (E.D.Pa. Apr. 12, 1996). The second observation is that only the first sentence penalizes the unauthorized publication of *both* "wire communications" and "radio communications." *Id.* The other three sentences only penalize activities involving "radio communication." *Id.* In other words, even though anyone can be held liable for publishing a "radio communication," only legitimate communication personnel may be held liable for publishing a "wire communication."

To determine whether the defendants are liable under Section 605 for the unauthorized publication of a cable television broadcast, it is first necessary to determine whether that cable television broadcast is a "radio communication" or a "wire communication." Under the United States Code, "wire communication" is defined as:

the transmission of writing, signs, signals, pictures, and sounds of all kinds *by aid of wire, cable, or other like connection between the points of origin and reception of such transmission,* including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. § 153(a) (1991) (emphasis added). On the other hand, the Code defines "radio communication" as:

the *transmission by radio* of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission.

47 U.S.C. § 153(b) (1991) (emphasis added).

■ Under these definitions, a "pure" cable television broadcast, one transmitted only over coaxial cable, is a "wire communication." Consequently, only legitimate communication personnel may be held liable for publishing this broadcast under Section 605. All other persons who publish this "pure" cable broadcast are only liable under Section 553. These definitions fail, however, when a cable broadcast originates from a satellite transmission and then is retransmitted over a coaxial cable network. If the broadcast is a "radio communication" because it originated from a satellite transmission, then Section 605 will hold any person who publishes the broadcast liable. If, on the other hand, the broadcast is a "wire communication" because it is distributed over a coaxial cable network, then only Section 553 will hold non-communication personnel who publish the broadcast liable. If, however, the broadcast is both a "radio communication" and a "wire communication", then the publisher of the cable broadcast is liable under both Sections 553 and 605. It is this dilemma which has been at the forefront of the federal courts' current debate about the application of Section 553 and 605 to cable television broadcasts.

Some courts, like the United States Court of Appeals for the Second Circuit, have determined that an expansive reading and ap-

plication of Section 605 is warranted. *International Cablevision, Inc. v. Sykes*, 75 F.3d 123, 131–132 (2d Cir.), *cert. denied sub nom., Noel v. International Cablevision, Inc.,* ——— U.S. ———, 117 S.Ct. 298, 136 L.Ed.2d 217 (1996). In *International Cablevision, Inc. v. Sykes,* the court of appeals reached its conclusion after reviewing the House Report's section-by-section analysis of Section 553, and discovering that, " 'Nothing in [§ 553] is intended to affect the applicability of existing Section 605 to theft of cable service, or any other remedies available under existing law for theft of service.' " *Id.* at 132 (quoting H.R.Rep. No. 934 at 83, *reprinted in* 1984 U.S.C.C.A.N. 4720). Based on this one sentence, the court determined that,

> [t]he continued transmission of radio signals via cable after their receipt at the headend of a cable television system can be regarded as the "receipt, forwarding and delivery of [radio] communications … incidental to [the transmission]" of the pictures and sounds transmitted by those communications within the meaning of § 153(b).

*Id.* at 131. In other words, the court held that a cable broadcast was a "radio communication" as long as the cable transmission originated as a radio signal.[9] *Id.* Therefore, under the *Sykes* court's interpretation, Section 605 will hold any person liable for the unauthorized publication of a cable television broadcast, which originated as a radio transmission. *Id.* Section 553, on the other hand, will only protect in-house cable television programming, that did "not involve any radio-originated communications." *Id.* at 131

n. 5; *accord TCI Cablevision of New England v. Pier House Inn, Inc.,* 930 F.Supp. 727, 734 (D.R.I.1996).

Other courts, like the United States Court of Appeals for the Seventh Circuit, have explicitly rejected this expansive interpretation. *Norris,* 88 F.3d at 469. In *United States v. Norris,* the court of appeals meticulously analyzed the statutes' legislative history and the *Sykes* decision. *Id.* at 464–69. The *Norris* court concluded that "[t]he fatal difficulty with the Second Circuit's analysis … [was] that it pluck[ed] one sentence of § 553(a)'s legislative history out of context and assign[ed] that sentence a meaning completely at odds with the context." *Id.* at 468. To avoid this pitfall, the Seventh Circuit chose not to emphasize this one sentence, but instead read it with the rest of the House Report.[10] *Id.* Based on this reading, the court of appeals concluded that:

> The only plausible, consistent interpretation … is that Congress intended for § 605 to apply to the unlawful interception of cable programming transmitted through the air, while it intended for § 553 to apply to the unlawful interception of cable programming while it is actually being transmitted over a cable system.

*Id.* at 469. Therefore, under the *Norris* court's interpretation, any person who publishes a cable broadcast transmitted through the air without authorization, is liable under Section 605. *Id.* However, only legitimate communications personnel are liable under Section 605 for publishing a cable broadcast actually transmitted over coaxial cable. *Id.* Section 553 is the exclusive remedy for all

---

**9.** This decision disagrees with an earlier decision by the court of appeals. Two years prior to the 1996 decision, the Second Circuit held that Section 605 applied to the theft of signals transmitted by radio waves, while Section 553 applied to the theft of signals transmitted directly over a coaxial cable. *International Cablevision, Inc. v. Sykes,* 997 F.2d 998, 1008 (2d Cir.1993).

**10.** The Seventh Circuit relied on the following language to determine Congress's intent:

> Nothing in this section is intended to affect the applicability of existing section 605 to theft of cable serve….
>
> \* \* \* \* \* \*
>
> The Committee intends the phrase "service offered over a cable system" [in § 553] to limit the applicability of [sec. 553] to theft of a

service from the point at which it is actually being delivered over the cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

*Id.* (quoting H.R.Rep. No. 934, at 83–84, *reprinted in* 1984 U.S.C.C.A.N. at 4720–21).

other persons who publish that cable broadcast. *Id.*

The United States Court of Appeals for the Third Circuit, has yet to examine the interplay between Sections 553 and 605. An examination of the decisions of other courts in our circuit, reveal that the issue is still unresolved. *Compare Nu–Tek Elecs.,* 1996 WL 402511, at *4 (holding section 605 inapplicable to interception of cable communications) *with TKR Cable Co. v. Cable City Corp.,* 1996 WL 465508 (D.N.J. Jul. 29, 1996) (holding sections 553 and 605 applicable to unlawful interception of cable television programming over a cable network) *and General Instrument Corp. of Delaware v. Lake Sylvan Sales, Inc.,* No. CIV.A.93–3856, 1993 WL 496588 (E.D.Pa. Nov. 30, 1993) (same). *But see Comcast Cablevision of Philadelphia v. Olsen,* No. CIV.A.94–1215, 1995 WL 498717 (E.D.Pa. Aug. 22, 1995) (holding section 605 inapplicable to interception of cable communications), *vacated in part,* No. CIV. A.94–1215 (E.D.Pa. Apr. 4, 1996) (holding section 605 applicable to interception of coaxial cable transmissions originating as radio transmissions, in light of *Sykes* decision). Furthermore, a review of other district court opinions from around the nation suggests that the disagreement among the courts in our circuit is not atypical. *Compare Don King Prods./Kingvision v. Lovato,* No. CIV. A.95–2827, 1996 WL 682006 (N.D.Cal. Nov. 15, 1996) (holding sections 553 and 605 applicable to unlawful interception of cable communications) *with Spencer Promotions, Inc. v. 5th Quarter Enter., Inc.,* No. CIV.A.94–0988, 1996 WL 438789 (N.D.Cal. Feb. 21, 1996) (holding section 605 applicable to interception of satellite cable broadcasts and section 553 applicable to interception of coaxial cable broadcasts). *See also That's Entertainment, Inc. v. Anciano's Inc.,* No. CIV. A.94–7199, 1996 WL 514989 (N.D.Ill. Sept. 6, 1996) (holding section 605 inapplicable to wire transmission of pay-per-view boxing event); *Pier House Inn, Inc.,* 930 F.Supp. at 738 (adopting *Norris* rationale and holding section 605 applicable to interception of satellite cable broadcasts and section 553 applicable to interception of coaxial cable broadcasts); *Time Warner Cable of New York City v. Freedom Elecs., Inc.,* 897 F.Supp. 1454 (S.D.Fla.1995) (holding sections 553 and 605 applicable to interception of coaxial cable broadcasts).

■ After reviewing the relevant case law, this Court is convinced that the interpretation set forth by the United States Court of Appeals for the Seventh Circuit, which to date has been adopted by one other United States District Courts, is consistent with Congress's intent. Therefore, this Court concludes that because a television signal transmitted through the air is a "radio communication," any person may be held liable under 47 U.S.C. § 605 for the unauthorized reception and publication of cable programming transmitted through the air. On the other hand, because a television signal transmitted over coaxial cable is a "wire communication," only legitimate communication personnel may be held liable for publishing a cable broadcast while it is actually being transmitted over a system of coaxial cables under 47 U.S.C. § 605. All other persons who publish a cable broadcast while it is actually being transmitted over a system of coaxial cables, however, may only be held liable under 47 U.S.C. § 553(a).

**b.  Sufficiency of Plaintiff's Allegations**

■ In this case, the plaintiff merely pleads that the defendants published the closed-circuit [11] boxing match to their patrons. It does not allege how the closed-circuit broadcast was being distributed, or whether the defendants published the cable programming directly from the coaxial cable system or from the satellite transmission. Without these critical facts, this Court cannot

---

**11.** "[I]n the boxing industry, closed circuit refers to a type of venue, not the method of transmitting the television signal." *Personal Preference Video, Inc. v. Home Box Office, Inc.,* 986 F.2d 110, 114 (5th Cir.1993). Nevertheless, most closed circuit broadcasts use coaxial cables for the transmission of its television signals. *Fortnightly,* 255 F.Supp. at 196. "Transmissions of closed-circuit telecasts are electronically scrambled to prevent viewing absent a subscription. When a subscriber purchases viewing rights, the signal is decoded to enable clear reception for viewing." *Storer Cable Comm. v. Joe's Place Bar & Restaurant,* 819 F.Supp. 593, 594 (W.D.Ky. 1993).

determine from the scantly pled allegations of the complaint whether Section 553 or Section 605 affords the plaintiff a cause of action against the defendants. Therefore, this Court concludes that the plaintiff's pleadings are insufficient to maintain a cause of action under 47 U.S.C. § 605. Accordingly, this claim is dismissed against the defendants.[12]

### 2. *State Law Claims*

■ In its complaint, the plaintiff alleges that the defendants are liable for conversion and interference with prospective economic advantage. The defendants urge for a dismissal of these state law claims, because there is no reasonable basis for the Court to exercise supplemental jurisdiction.

Pursuant to § 1367, this Court may exercise supplemental jurisdiction over state law claims. However, the Court may decline supplemental jurisdiction if:

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

28 U.S.C. § 1367(c). The Court may properly decline to exercise supplemental jurisdiction and dismiss the state claims if any one of these applies. *See Growth Horizons, Inc. v. Delaware County*, 983 F.2d 1277, 1284 (3d Cir.1993).

■ The Courts in this district "ordinarily decline to exercise supplemental jurisdiction over state law claims when the federal claims are dismissed." *Eberts v. Wert*, 1993 WL 304111, *5 (E.D.Pa. Aug. 9, 1993), *aff'd*, 22 F.3d 301 (3d Cir.1994) (table). In the instant case, this Court has dismissed the

plaintiff's federal cause of action. Thus, it is appropriate to decline to exercise supplemental jurisdiction over the remaining state law claims.

Accordingly, this Court dismisses all of the plaintiff's claims against defendants Lennon's Bar, Inc., James Lennon, and Gloria Lennon.

### C. *Claims Against Remaining Defendants*

■ A district court may dismiss all or part of a complaint *sua sponte* if the procedure used to raise the issue is a fair one. *Bowman v. United States*, No. CIV. A.95–5863, 1995 WL 650239, at *1 (E.D.Pa. Nov.1, 1995); *see* Charles Alan Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1357 at 301 (2d ed, 1990) ("Even if a party does not make a formal motion, the court on its own initiative may note the inadequacy of the complaint and dismiss it for failure to state a claim as long as the procedure employed is fair."). Moreover, a district court may grant summary judgment *sua sponte* if it gives notice and an opportunity to oppose summary judgment. *Otis Elevator Co. v. George Washington Hotel Corp.*, 27 F.3d 903, 910 (3d Cir.1994).

■ In this case, this Court has determined that the plaintiff's pleadings are insufficient to maintain a cause of action under 47 U.S.C. § 605, and has declined to exercise supplemental jurisdiction over the plaintiff's state law claims. Therefore, logic dictates that if the complaint fails for one defendant, it must fail for the remaining defendants.

The plaintiff has known since the filing of the instant motion that this Court could dismiss its complaint for failing to state a claim upon which relief may be granted. Additionally, the plaintiff has known that the answers of defendants Ralph Ziegler, Ralph Ziegler t/a Blue Room, Galway's Pub, Ltd., David Galway, and Wilhelmina Galway explicitly set forth failure to state a claim upon which relief may be granted as a defense.[13] Ac-

---

12. Because this Court dismisses the 47 U.S.C. § 605 claim, it is unnecessary to determine whether the plaintiff has standing to sue under this statute.

13. Because Defendants Ralph Ziegler, Ralph Ziegler t/a Blue Room, Galway's Pub, Ltd., David Galway, and Wilhelmina Galway answered the plaintiff's complaint on July 2, 1996, (Ans. of 7/19/96, Docket Nos. 2 & 3), this Court must analyze the sufficiency of the plaintiff's claims

cordingly, this Court will dismiss all of the plaintiff's claims against all of the defendants. However, in the interest of justice, this Court, pursuant to Federal Rule of Civil Procedure 15(a), will allow the plaintiff twenty (20) days to amend its complaint to conform with this Court's opinion.

An appropriate Order follows.

### ORDER

AND NOW, this 28th day of January, 1997, upon consideration of the Motion of Defendants Lennon's Bar, Inc., James Lennon, and Gloria Lennon to Dismiss the Plaintiff's Complaint, IT IS HEREBY ORDERED that the Defendants' Motion is **GRANTED.**

IT IS FURTHER ORDERED that:

(1) all of the claims set forth in the Plaintiff's Complaint are **DISMISSED** against all Defendants; and

(2) the Plaintiff shall have twenty (20) days from the date of this Order to amend its Complaint.

against these defendants under the summary judgment standard.