UNITED STATES of America,
Plaintiff–Appellant,

v.

William C. NORRIS, Defendant–Appellee.

No. 95–1402.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 29, 1995.

Decided July 3, 1996.

**463**

Ruth Hennage (argued), Office of the United States Attorney, South Bend, IN, for Plaintiff–Appellant.

Charles A. Asher (argued), South Bend, IN, for Defendant–Appellee.

Before POSNER, Chief Judge, and KANNE and DIANE P. WOOD, Circuit Judges.

KANNE, Circuit Judge.

William Norris allegedly modified and sold cable television decoder boxes, as well as sold the equipment with which customers could themselves modify decoder boxes. A federal grand jury returned a superseding indictment charging Norris with, among other things, several counts of violating the second part of 47 U.S.C. § 605(e)(4), which by reference to 47 U.S.C. § 605(a) prohibits facilitation of the unauthorized interception of radio communications. The district court dismissed these counts, holding that the cable television programming that Norris allegedly helped intercept did not constitute communications by radio, and we affirm.

## I. HISTORY

The government alleges that from December 1989 to February 1993, William Norris modified and sold cable television descrambler equipment, thereby allowing his customers to receive premium cable television programming without paying the required subscription fee to their local cable companies. He allegedly modified, and then sold, cable television decoder boxes by installing chips or modules that would enable the decoder boxes to receive and descramble all premium cable channels. He also alleged-

ly sold the chips and modules separately, with tools and instructions so that his customers could modify their own cable television decoder boxes.

On February 4, 1993, a federal grand jury returned an indictment charging Norris with mail fraud, wire fraud, and violations of the first part of 47 U.S.C. § 605(e)(4), which is directed at "[a]ny person who manufactures, assembles, modifies, imports, exports, sells, or distributes any electronic, mechanical, or other device or equipment, knowing or having reason to know that the device or equipment is primarily of assistance in the unauthorized decryption of satellite cable programming...." On Norris's motion, the district court dismissed those counts of the indictment alleging violations of the first part of § 605(e)(4), holding that Norris's alleged conduct did not constitute the unauthorized decryption of "satellite cable programming," as defined in 47 U.S.C. § 605(d)(1). The district court opined that the appropriate prosecutorial vehicle for Norris's alleged conduct was instead 47 U.S.C. § 553, which provides that "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law." 47 U.S.C. § 553(a)(1).

Under § 553(b), Norris's potential criminal punishment for violations of § 553(a) perpetrated prior to December 4, 1992, would be up to both one year in prison and a $25,000 fine for his first offense, and up to both two years in prison and a $50,000 fine for subsequent offenses. 47 U.S.C. § 553(b) (1992), *amended by* Cable Television Consumer Protection and Competition Act of 1992, Pub.L. No. 102–385, § 21, 106 Stat. 1460, 1498. For his subsequent violations allegedly perpetrated after December 4, 1992, Norris's potential criminal punishment would be up to both five years' imprisonment and a $100,000 fine for each violation. 47 U.S.C. § 553(b)(2). The government, however, does not consider these authorized punishments to constitute a sufficiently heavy sanction for Norris's alleged wrongdoing. They would prefer to

prosecute Norris under § 605(e)(4), which authorizes criminal punishment of up to both five years in prison and a $500,000 fine for each violation (including the first). 47 U.S.C. § 605(e)(4).

Accordingly, after the district court's dismissal of those counts in the original indictment alleging a violation of the first part of § 605(e)(4), the government appealed to this court. However, the government did not challenge on appeal the district court's specific holding that Norris's alleged conduct was not facilitation of the unauthorized decryption of satellite cable programming. Instead, the government attempted to argue that Norris's alleged conduct violated the *second* part of § 605(e)(4), which criminalizes the facilitation of any conduct prohibited in § 605(a). The third clause of § 605(a), in turn, provides that "[n]o person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto." 47 U.S.C. § 605(a).

In response to the government's arguments on appeal, we held that the question of whether Norris's alleged conduct violated the second part of § 605(e)(4) was not properly before us because the indictment specifically alleged only violations of the first part of § 605(e)(4). *United States v. Norris,* 34 F.3d 530, 532–33 (7th Cir.1994). Thus, the government returned to the grand jury, and on October 5, 1994, the grand jury handed down a superseding indictment charging Norris with mail fraud, wire fraud, and several violations of the second part of § 605(e)(4). The district court then dismissed those counts of the superseding indictment charging violations of § 605(e)(4), holding that the modification of cable television decoder boxes does not facilitate the interception of "communication[s] by radio" and therefore is not prohibited conduct under § 605(a) and (e)(4).

The government filed a timely notice of appeal on February 10, 1995, and we may now properly address the question of whether the cable television programming that Norris's cable television decoder equipment allegedly helped intercept constitutes "communication by radio" as defined in 47 U.S.C. § 153(b), and thus whether the government's complaint properly alleges Norris's violation of § 605(a) and (e)(4).

## II. ANALYSIS

Congress first ventured into significant regulation of radio traffic with an "Act to Regulate Radio Communication," enacted in 1912. Act of Aug. 13, 1912, ch. 287, 37 Stat. 302. The 1912 Act defined "radio communication" as "any system of electrical communication by telegraphy or telephony without the aid of any wire connecting the points from and at which the radiograms, signals, or other communications are sent or received." *Id.* § 6, 37 Stat. at 308. Thus, Congress established that radio and wire communications would be mutually exclusive by definition: radio was essentially defined as any electronic telecommunication that was not a wire communication.

Fifteen years later, Congress repealed the 1912 Act and passed the Radio Act of 1927, ch. 169, 44 Stat. 1162. This Act created the Federal Radio Commission, an executive agency charged with carrying out the Act's more comprehensive scheme of regulations governing radio traffic. *Id.* § 3–5, 44 Stat. at 1162–65. The Radio Act broadened the 1912 Act's technically unsophisticated definition of "radio communication" in response to improved technology, such as the ability to electronically transmit visual images. The Radio Act's definition of "radio communication" included "any intelligence, message, signal, power, pictures, or communication of any nature transferred by electrical energy from one point to another without the aid of any wire connecting the points from and at which the electrical energy is sent or received and any system by means of which such transfer of energy is effected." *Id.* § 31, 44 Stat. at 1173. Thus, Congress continued to classify radio and wire communications as definitionally distinct.

The Radio Act of 1927 was superseded by the Communications Act of 1934, which created the Federal Communications Commission to have consolidated jurisdiction for regulating radio *and* wire communications.

Communications Act of 1934, ch. 652, 48 Stat. 1064. As part of its combined regulatory scheme, the Communications Act contained a secrecy provision applicable to both wire and radio transmissions, which is codified as amended at 47 U.S.C. § 605(a). The provision contained four clauses prohibiting: (1) the unauthorized divulging or publishing of wire or radio communications by the operators responsible for receiving such communications; (2) the unauthorized interception and divulging of wire or radio communications; (3) the unauthorized receipt and use of wire or radio communications for the benefit of the unauthorized receiver or someone else not entitled to the communication; and (4) the divulging, publication, or use of unlawfully intercepted information by anyone knowing that the information was wrongfully obtained. Communications Act of 1934, ch. 652, Title VII, § 705, 48 Stat. at 1103.

The Communications Act also enunciated the definitions of wire and radio communications that exist to this day as 47 U.S.C. § 153(a)-(b). The Act defines "wire communication" as "the transmission of writing, signs, signals, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." Communications Act of 1934, ch. 652, Title I, § 3, 48 Stat. at 1065 (codified at 47 U.S.C. § 153(a)). "Radio communication" is defined as "the transmission by radio of writing, signs, signals, pictures, and sounds of all kinds, including all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmission." *Id.* (codified at 47 U.S.C. § 153(b)). Although these more intricate definitions are intended to be clearer and more precise than their technologically unsophisticated predecessors, nothing in any of the Communications Act's text or legislative history indicates a congressional intent to blur the historical demarcation between radio and wire communications. On the contrary, the text of the Communications Act reinforces the definitional distinc-

tion between radio and wire communications through its repeated disjunctive references to "radio *or* wire" communications.

Any doubt of Congress's intent to treat radio and wire communications as separate and distinct under the Communications Act was erased by the 1968 Omnibus Crime Control and Safe Streets Act, Pub.L. No. 90–351, 82 Stat. 197. The 1968 Omnibus Crime Control Act amended what is now § 605(a) to remove reference to wire communications from all but the first clause, which prohibits the divulging of wire or radio transmissions by communications personnel. 1968 Omnibus Crime Control Act, § 803, 82 Stat. at 223. In conjunction with this amendment, the Act included sweeping laws governing the interception of wire and oral communications, which are codified at chapter 119 of title 18 of the United States Code, 18 U.S.C. § 2510 *et seq.* 1968 Omnibus Crime Control Act, § 802, 82 Stat. at 212–13. These new laws endeavored to regulate comprehensively all types of possible interception of wire and oral communications, but, unlike the pre-amendment § 605, chapter 119 contained provisions expanding law enforcement's use of wiretaps, pen registers, and the like. *See* 18 U.S.C. §§ 2516–18. The legislative history of the 1968 Omnibus Crime Control Act explains that with respect to *wire* communications, the amended § 605 was "designed to regulate the conduct of communications personnel," while "[t]he regulation of the interception of wire or oral communications in the future is to be governed by proposed new chapter 119 of title 18, United States Code." S. REP. No. 1097, 90th Cong., 2d Sess., *reprinted in* 1968 U.S.C.C.A.N. 2196–97. In fact, we have stated that "the clear intent of Congress would seem to be that the interception of wire communications would be governed solely by the new Chapter 119." *Korman v. United States*, 486 F.2d 926, 931 (7th Cir.1973).

Unfortunately, the regulatory scheme created by the 1968 Omnibus Crime Control Act left a gap. The Act amended what is now § 605(a) to remove reference to wire communications in clauses two, three, and four, and enacted chapter 119 to govern the interception of oral and wire communications. How-

ever, the definition of "wire communication" for purposes of chapter 119, 18 U.S.C. § 2510(1), is narrower than the definition of "wire communication" in title 47, 47 U.S.C. § 153(a). Section 2510(1) limits its definition of wire communication to *aural* communications transmitted through a wire or cable facility operated by a *common carrier*. 18 U.S.C. § 2510(1). And the Supreme Court noted in *United States v. Southwestern Cable Co.*, 392 U.S. 157, 169 n. 29, 88 S.Ct. 1994, 2000 n. 29, 20 L.Ed.2d 1001 (1968), that cable television providers are not common carriers, and therefore cable television programming does not fall under the 18 U.S.C. § 2510(1) definition of wire communication.

As a result, Congress passed 47 U.S.C. § 553(a), which prohibits the unauthorized "intercept[ing] or receiv[ing] or assist[ing] in intercepting or receiving any communications service offered over a cable system," as part of the Cable Communications Policy Act of 1984, Pub L. No. 98549, § 2, 98 Stat. 2779, 2796. Congress enacted § 553 in an effort to remedy "a problem which was increasingly plaguing the cable industry—theft of cable services," including "the manufacture and sale of equipment intended to permit reception of cable services without paying for it...." H.R. REP. No. 934, 98th Cong., 2d Sess. 83, *reprinted in* 1984 U.S.C.C.A.N. 4720. In addition, the Cable Communications Policy Act enacted stiff penalties for violations of § 605(a), *see* 47 U.S.C. § 605(e)(1)-(3), and even stiffer penalties for those who manufacture or distribute equipment to be used for intercepting satellite cable programming or for any other violation of § 605(a), *see* 47 U.S.C. § 605(e)(4). Cable Communications Policy Act, § 5, 98 Stat. at 2802–03.

The legislative history accompanying the passage of the Cable Communications Policy Act describes the respective coverage of § 605(a) and § 553(a) concerning the unlawful interception of cable television programming:

Nothing in [sec. 553] is intended to affect the applicability of existing section 605 to theft of cable service, or any other reme-

dies available under existing law for theft of service.

.    .    .    .    .

The Committee intends the phrase "service offered over a cable system" to limit the applicability of [sec. 553] to theft of a service from the point at which it is actually being delivered over the cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

.    .    .    .    .

Hence, [sec. 553(a)(2) ] is primarily aimed at preventing the manufacture and distribution of so-called "black boxes" and other unauthorized converters which permit reception of cable service without paying for the service.

H.R. REP. No. 934, at 83–84, *reprinted in* 1984 U.S.C.C.A.N. at 4720–21. The district court considered this to be a clear indication of Congress's intent that where cable programming is broadcast through the air and then retransmitted by a local cable company over a cable network, § 605 should govern the interception of the satellite or radio transmission through the air, while § 553(a) should govern the interception of the retransmission over a cable network, specifically the manufacture and distribution of decoder boxes (the conduct that Norris is alleged to have engaged in).

The government contends, however, that *both* § 553(a) and § 605(a) apply to the interception of cable television programming transmitted over a cable network and that it may therefore choose under which section to prosecute Norris. Despite the seemingly obvious facial conclusion that the § 153(a) definition of wire communications as transmissions "by aid of wire, cable, or other like connection" would include cable television signals transmitted over a cable network, while the § 153(b) definition of radio communications as "transmission[s] by radio" would

not, the government puts forth two textual arguments that such cable programming transmissions are in fact "radio communication[s]" and therefore that Norris may be prosecuted under § 605(a) and (e)(4).

First, the government argues that because wire transmissions are technically radio waves (electrical energy with a wavelength in the "radio wave" band of the electromagnetic spectrum) delivered through the conduit of a conducting cable, all wire communications (except, perhaps, fiber optic transmissions) are included within the definition of communication by radio. This argument, however, impermissibly conflates the definitions of wire and radio communications under Title 47—definitions which for over eighty years Congress has treated as distinct and mutually exclusive. To treat all wire communications as also being radio communications would be to undo the system of regulation created by the 1968 Omnibus Crime Control Act. Chapter 119's provisions facilitating federal law enforcement's expansive use of wiretaps, pen registers, and other clandestine forms of evidence gathering would be rendered useless if such interceptions also fell subject to the prohibitions of § 605. We are hard pressed to understand why in order to procure a marginally higher penalty for Mr. Norris, the government advocates a position that, if adopted, would strip it of so much investigative power.

Secondly, the government argues that the nature of cable television programming distribution causes cable transmissions to fall within the definition of radio communication rather than wire communication. In general, national and local television networks broadcast their signals through the air as radio waves, while other national and premium cable television programmers transmit their programming as powerful radio waves via satellite. These radio transmissions are received by local cable television providers, which then combine the signals with those of other providers and transmit them directly to decoder boxes in their customers' homes through a network of coaxial cables. The § 153(a) definition of "wire communication" encompasses transmissions by wire or cable connections "between the points of origin and reception of such transmission." 47 U.S.C. § 153(a). Thus, the government maintains that because part of the entire passage of cable television programming from programmer to consumer is through the air, cable television transmissions cannot be considered wire communications. On the other hand, the definition of radio communication includes, in addition to transmissions by radio, "all instrumentalities, facilities, apparatus, and services (among other things, the receipt, forwarding, and delivery of communications) incidental to such transmissions." 47 U.S.C. § 153(b). From this, the government asserts that a local cable provider's retransmission of cable programming over a cable network is merely "receipt, forwarding, and delivery" that is "incidental" to the original radio transmission and that it is therefore a "radio communication."

However, if the government's argument is taken to its full conclusion, it, like the government's first argument, unacceptably blurs the line between radio and wire communications. For example, under the government's reading of § 153(a)-(b), the wire portion of a cordless phone conversation is not a "wire communication," and could be considered a radio communication, because of the brief radio transmission through the air between the handset and the phone's console. The government's unduly literal interpretation of "between the points of origin and reception," together with its insistence on collapsing an item of information's multi-legged journey from sender to recipient into one giant transmission, would even exclude telegraph and ordinary telephone transmissions from the definition of "wire communication" because there must presumably be an oral communication from the message sender to the telegraph operator and from the speaker's vocal cords to the telephone mouthpiece. We reject such a strained reading of § 153, and must instead adopt a common sense interpretation of the statute's plain language. A "wire communication," for purposes of Title 47, includes transmissions from point "A" to point "B" by means of wire, cable, or similar connection. 47 U.S.C. § 153(a). The fact that the information arrived at point "A" by way of radio does not render the wire transmission a "radio communication" unless the

wire between point "A" and point "B" is in fact the type of facility or apparatus that is truly "incidental" to the radio transmission. We cannot hold that local cable providers' transmissions over their cable networks are merely "incidental" to the radio transmissions of cable programming sent from the original programmers. The radio transmissions from the cable programmers are not merely routed or directed by the local cable companies. The radio transmissions are combined, sorted into channels, and retransmitted over often quite extensive cable networks. In fact, Congress speaks of the radio transmittal from programmer to local provider and the cable transmittal from local provider to ultimate consumer as separate transmissions when, in § 605(d)(1), it defines "satellite cable programming" as "video programming which is transmitted via satellite and which is primarily intended for the direct receipt by cable operators for their retransmission to cable subscribers." 47 U.S.C. § 605(d)(1).

In addition to rendering the 1968 Omnibus Crime Control Act's regulatory scheme meaningless by collapsing the distinction between the Title 47 definitions of wire and radio communications, the government's arguments that all conduct governed by § 553 also falls within the ambit of § 605 supposes that Congress's enactment of § 553(a) when it passed the Cable Communications Policy Act was superfluous—a supposition that under traditional canons of statutory construction we cannot endorse. See *Boise Cascade Corp. v. EPA,* 942 F.2d 1427, 1432 (9th Cir. 1991); *United States v. Caldera–Herrera,* 930 F.2d 409, 411 (5th Cir.1991) (citing *FAA v. Robertson,* 422 U.S. 255, 261, 95 S.Ct. 2140, 2145, 45 L.Ed.2d 164 (1975)). If Congress had intended § 605 to govern the interception of cable television programming offered over a cable network, it would have had no reason to enact § 553. A more logical interpretation of Congress's simultaneous enactment of § 553 and § 605(e)(4) in the Cable Communications Policy Act is found in the legislative history of that Act, where Congress indicated its intention that the interception of cable television programming as it

travels through the air is to be governed by § 605, while the interception of cable television programming traveling over a cable network (and specifically, the manufacture and distribution of decoder boxes) is to be governed by § 553(a). See H.R. REP. No. 934, at 83–84, *reprinted in* 1984 U.S.C.C.A.N. at 4720–21.

The government argues, however, that this interpretation of the legislative history accompanying § 553(a) is incorrect, and it cites a recent Second Circuit decision as support. See *International Cablevision, Inc. v. Sykes,* 75 F.3d 123, 131–33 (2d Cir.1996) (holding that Congress intended both § 553(a) and § 605(a) to apply to the unlawful interception of cable television programming offered over a cable network).* In *International Cablevision,* the Second Circuit pointed to three district court civil cases, decided between the passage of the 1968 Omnibus Crime Control and the Cable Communications Policy Acts, which attempted to judicially fill the gap created by the 1968 Omnibus Crime Control Act by extending § 605(a) to cover the interception of cable programming over a cable network. *Id.* at 130 (citing *Ciminelli v. Cablevision,* 583 F.Supp. 158, 163–64 (E.D.N.Y. 1984); *Cox Cable Cleveland Area, Inc. v. King,* 582 F.Supp. 376, 380 (N.D.Ohio1983); *Porter County Cable Co., Inc. v. Moyer,* 624 F.Supp. 1 (N.D.Ind.1983)). Because one sentence in the legislative history attendant to § 553(a) states that "[n]othing in [sec. 553] is intended to affect the applicability of existing section 605 to theft of cable service," H.R. REP. No. 934, at 83, *reprinted in* 1984 U.S.C.C.A.N. at 4720, and because the three cases cited above had been decided prior to § 553(a)'s enactment, the Second Circuit held that Congress's implied intent was for § 605 to apply to the interception of cable programming transmitted over a cable network. *International Cablevision,* 75 F.3d at 131–33.

The fatal difficulty with the Second Circuit's analysis, however, is that it plucks one sentence of § 553(a)'s legislative history out of context and assigns that sentence a meaning completely at odds with the context. The

---

* Because this opinion creates a conflict between or among the circuits, it was circulated before

release pursuant to 7TH CIR. R. 40(e). No judge in active service requested a rehearing en banc.

relevant portion of the House Report's section-by-section analysis of § 553 states:

> Nothing in this section is intended to affect the applicability of existing section 605 to theft of cable service....
>
> .    .    .    .    .
>
> The Committee intends the phrase "service offered over a cable system" [in § 553] to limit the applicability of [sec. 553] to theft of a service from the point at which it is actually being delivered over the cable system. Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605 to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.

H.R. REP. No. 934, at 83–84, *reprinted in* 1984 U.S.C.C.A.N. at 4720–21. The only plausible, consistent interpretation of these three sentences together is that Congress intended for § 605 to apply to the unlawful interception of cable programming transmitted through the air, while it intended for § 553 to apply to the unlawful interception of cable programming while it is actually being transmitted over a cable system.

The Second Circuit held that the second and third sentences of this quoted passage should be read as "establishing § 605's exclusive jurisdiction over the transmission of a television signal by radio prior to the transmission of that same signal by cable, rather than as barring the application of § 605 to the subsequent cable transmission of the signal." *International Cablevision,* 75 F.3d at 132. However, if Congress had truly intended that § 605 apply to both the airborne and cable transmissions of cable television programming, the third sentence of the above passage would simply read: "Thus, situations arising with respect to the reception of services which are transmitted over-the-air (or through another technology), but which are also distributed over a cable system, continue to be subject to resolution under section 605." But the third sentence does not stop there. It instead states that such situations "continue to be subject to resolution under section 605 *to the extent reception or interception occurs prior to or not in connection with, distribution of the service over a cable system.*" H.R. REP. No. 934, at 83–84, *reprinted in* 1984 U.S.C.C.A.N. at 4720–21 (emphasis added). This language cannot be reconciled with the conclusion that § 605 applies to the unlawful interception of cable television programming transmitted over a cable network.

Thus, we cannot agree with the government that § 553(a) and § 605(a) are overlapping statutes and that Congress intended to give the Department of Justice sole discretion concerning under which statute to proceed. Rather, we find that cable television programming transmitted over a cable network is not a "radio communication" as defined in § 153(b), and thus its unlawful interception must be prosecuted under § 553(a) and not § 605. As such, the government has failed to properly allege a violation by Norris of either part of § 605(e)(4).

The judgment of the district court dismissing counts 19–27 of the superseding indictment is AFFIRMED.