**KINGVISION PAY PER VIEW, LTD., Plaintiff,**

v.

**Scott D. DUERMEIER, Dean Duermeier, and SDD, Inc., Defendants.**

**Civil Action No. 97–2609–KHV.**

United States District Court, D. Kansas.

Oct. 9, 1998.

Order Denying Motion to Amend Judgement, Oct. 21, 1998.

Michael L. Matula, Rex A. Sharp, Husch & Eppenberger, Kansas City, MO, for plaintiff.

William R. Vincent, Law Offices of William R. Vincent, P.A., Topeka, KS, for defendants.

## MEMORANDUM AND ORDER

VRATIL, District Judge.

Kingvision Pay Per View, Ltd. ("Kingvision") seeks statutory damages under the Cable Communications Policy Act of 1984, codified as amended at 47 U.S.C. § 521 et seq., for defendants' unauthorized exhibition of a prize fight between Mike Tyson and Evander Holyfield.[1] This matter comes before the Court on the *Motion of Defendants For Summary Judgment* (Doc. # 34) filed September 29, 1998, and the *Motion of Plaintiff Kingvision Pay Per View For Partial Summary Judgment* (Doc. # 32) filed September 8, 1998. For the reasons stated below, the Court finds that defendants are entitled to summary judgment.

### Summary Judgment Standards

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *accord Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Once the moving party meets its burden, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. A "genuine" factual dispute re-

---

1. The Court refers to defendants collectively. Named defendants include S.D.D., Inc., a Kansas corporation, its owner, Scott D. Duermeier, and one of its agents, Dean Duermeier.

quires more than a mere scintilla of evidence. *Id.* at 252, 106 S.Ct. 2505.

In considering a summary motion the Court must view the evidence in the light most favorable to the nonmoving party. *Tom v. First Am. Credit Union,* 151 F.3d 1289, 1291 (10th Cir.1998). Summary judgment may be granted, however, if the nonmoving party's evidence is merely colorable or is not significantly probative. *Anderson,* 477 U.S. at 250–51, 106 S.Ct. 2505. Thus, " '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party,' summary judgment in favor of the moving party is proper." *Thomas v. IBM,* 48 F.3d 478, 484 (10th Cir.1995) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)).

## Factual Background

The parties have stipulated to the following material facts. Kingvision owned rights to exhibit and distribute on closed circuit television the live telecast of the professional prize fight between Mike Tyson and Evander Holyfield on November 9, 1996. The parties appropriately refer to this event as "the Event." Kingvision specifically owned the right to distribute the Event to closed-circuit locations such as theaters, arenas, bars, clubs and restaurants throughout Kansas.

The closed-circuit broadcast was intended solely for those who had purchased the Event from Kingvision or a local cable provider. The local cable provider, TCI, had the right to provide the Event to residential cable customers but it did not provide live pay per view programming to commercial establishments. Therefore, for a commercial establishment to lawfully receive the Event, it had to contract with Kingvision. Transmission of the Event was electronically coded or scrambled and it had to be decoded with electronic decoding equipment. Commercial establishments that contracted with Kingvision were provided the electronic decoding equipment and satellite coordinates which were necessary to receive an authorized and uninterrupted signal of the Event. Kingvision's licensing fee was $17.50 times the maximum authorized fire capacity of the establishment.

Defendants own and operate a bar called Mr. D's. Defendants did not contract with Kingvision to receive and exhibit the Event at Mr. D's, but Dean Duermeier contracted with TCI to receive and view the Event in his apartment—which adjoined the bar. TCI received the telecast via satellite radio waves and forwarded it to Duermeier's apartment through cable wire which first ran through Duermeier's VCR and then entered his television. Duermeier recorded the Event on his VCR.

The Event aired at 8:00 p.m. Shortly after midnight, when the fight was over, Duermeier took his videotape to Mr. D's and began to play it for bar employees and patrons. Moments later, an investigator for Kingvision presented Mr. D's a cease and desist letter, and Mr. D's stopped the replay. The tape had been displayed for approximately eight minutes.

Neither Scott Duermeier nor Mr. D's was authorized to receive, exhibit, or transmit the Event. Dean Duermeier was authorized to receive the communication of the Event at his apartment because of his agreement with TCI.

## Analysis

Kingvision seeks summary judgment under the Cable Communications Policy Act, 47 U.S.C. §§ 553 and 605. In general, § 553 penalizes the unauthorized reception of cable services, while § 605 penalizes the unauthorized reception and publication of wire and radio communication.

Section 553 provides:

Unauthorized reception of cable service

(a) Unauthorized interception or receipt or assistance in intercepting or receiving service; "assist in intercepting or receiving" defined

(1) No person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator or as may otherwise be specifically authorized by law.

(2) For the purpose of this section, the term "assist in intercepting or receiving" shall include the manufacture or distribution of equipment intended by the manu-

facturer or distributor (as the case may be) for unauthorized reception of any communications service offered over a cable system in violation of subparagraph (1).

47 U.S.C. § 553.

Courts have interpreted the term "cable system" in § 553 to include coaxial cable or wire. *See Kingvision Pay Per View, Ltd. v. Williams,* 1 F.Supp.2d 1481, 1483 (S.D.Ga. 1998) (citing *United States v. Norris,* 88 F.3d 462, 467–69 (7th Cir.1996); *Joe Hand Promotions v. Rennard Street Enters.,* 954 F.Supp. 1046, 1053–54 (E.D.Pa.1997); *TCI Cablevision v. Pier House Inn., Inc.,* 930 F.Supp. 727, 734 (D.R.I.1996)). *But see International Cablevision, Inc. v. Sykes,* 75 F.3d 123 (2d Cir.1996) (holding that § 605 applies to distribution of descramblers for interception of cable television and that § 553 applies to any transmission via cable, whether or not it originates as radio transmission).

Section 605 provides in relevant part:

(a) Practices prohibited

[Sentence 1:] Except as authorized by chapter 119, Title 18, no person receiving, assisting in receiving, transmitting, or assisting in transmitting, any interstate or foreign communication by *wire or radio* shall divulge or publish the existence, contents, substance, purport, effect, or meaning thereof, except through authorized channels of transmission or reception, (1) to any person other than the addressee, his agent, or attorney, (2) to a person employed or authorized to forward such communication to its destination, (3) to proper accounting or distributing officers of the various communicating centers over which the communication may be passed, (4) to the master of a ship under whom he is serving, (5) in response to a subpoena issued by a court of competent jurisdiction, or (6) on demand of other lawful authority. [Sentence 2:] No person not being authorized by the sender shall intercept any *radio* communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. [Sentence 3:] No person not being entitled thereto shall receive or assist in receiving any interstate or foreign communication by *radio* and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto. [Sentence 4:] No person having received any intercepted *radio* communication or having become acquainted with the contents, substance, purport, effect, or meaning of such communication (or any part thereof) knowing that such communication was intercepted, shall divulge or publish the existence, contents, substance, purport, effect, or meaning of such communication (or any part thereof) or use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a) (emphasis added).

Plaintiff argues that defendant is liable under the first, second, and third sentences of § 605 because Duermeier received and intercepted the transmission by wire and divulged or published the content via videotape to persons not authorized to receive it. *See That's Entertainment, Inc., v. J.P.T.,* 843 F.Supp. 995 (D.Md.1993) (defendant who was authorized to receive only residential cable service was liable under first sentence of § 605 for broadcasting fight to commercial patrons.). Plaintiff also asserts that defendants violated the § 553 prohibition against intercepting or receiving communications service over a cable system without authorization. *See* 47 U.S.C. § 553(a)(1). Defendants essentially argue that they did not violate § 553 or § 605 because Duermeier was authorized to receive the transmission through his home cable service.

Sections 553 and 605 have generated numerous cases which grapple with how to apply potentially overlapping provisions to various fact situations. Courts have extensively reviewed the legislative history of the Act and its predecessors but have reached varying conclusions. The Seventh Circuit has determined that "cable television programming transmitted over a cable network is not a 'radio communication' as defined in 153(b) and thus its unlawful interception must be prosecuted under 553(a) and not 605." *United States v. Norris,* 88 F.3d 462 (7th Cir. 1996). The Second Circuit, on the other hand, held that §§ 605 and 553 are both

applicable to the interception of cable television services. *See International Cablevision, Inc., v. Sykes*, 75 F.3d at 133 (noting that this interpretation results in some overlap between § 553 and § 605 but stating that "it is for Congress, not the courts, to address any perceived resulting disorder").

Although the Tenth Circuit has not addressed this issue, a recent district of Kansas decision cited *Norris* with approval. *See Kingvision Pay Per View, Ltd. v. Owens*, 982 F.Supp. 803 (D.Kan.1997). "Courts generally have held that section 605 applies to interception or receipt of cable television signals 'before they begin to travel through the cable,' while section 553 applies to the 'interception or receipt of cable service transmissions at the point in the system that the transmission is carried by coaxial cable or wires.'" 982 F.Supp. at 805 (quoting *TCI Cablevision of New England v. Pier House Inn. Inc.*, 930 F.Supp. 727, 735 (D.R.I.1996)) (adopting rationale of *United States v. Norris*, and rejecting rationale of *International Cablevision* ). Without repeating the extensive legislative history analysis and statutory construction, this Court also adopts the reasoning of *Norris*. The Court further notes that although first sentence of § 605 suggests that it applies to both wire and radio communications, even the Second Circuit in *Sykes* acknowledges that the first sentence of § 605 is probably "intended to regulate the conduct of communications personnel—i.e., those legitimately involved in transmitting or receiving radio or wire communications— rather than to address the problem of unauthorized interception or reception of communications." 75 F.3d at 131. Thus defendants can not be liable under the first sentence of § 605. The remaining provisions of § 605, under *Norris*, apply only to radio and not cable communications. Thus, because the broadcast at issue here was received over cable wire, defendants are not liable under § 605.

Plaintiff also alleges that defendants violated § 553 by "intercepting or receiving" a cable communication without being "specifically authorized to do so by a cable operator." *See* 47 U.S.C. § 553. The word "intercept" indicates "the taking or seizure by the way or before arrival at the destined place." *Goldman v. United States*, 316 U.S. 129, 134,

62 S.Ct. 993, 86 L.Ed. 1322 (1942), overruled on other grounds, *Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Arguably Duermeier did not "intercept" the transmission because he contracted to have the communication arrive at his apartment and it arrived there. On the other hand, plaintiff argues that the transmission reached his VCR before it went to his television, and Duermeier thus "intercepted' it just before it arrived at the destined place—his television. The Court rejects this argument. *See That's Entertainment, Inc. v. Anciano's Inc.*, 1996 WL 514989 at * 2 (N.D.Ill. Sept.6, 1996) (where event arrived via cable wire at cable-connection to customer's home and was then videotaped, "it cannot fairly be said that the communication service was 'intercepted' "); *see also Cablevision of Michigan, Inc. v. Sports Palace, Inc.*, 1994 WL 245584 at * 4, 27 F.3d 566 (6th Cir. June 6, 1994) (ordinary meaning of intercept is "to stop, seize, or interrupt in progress or course or before arrival").

Duermeier did "receive" the program, and this element of § 553 is thus met. But § 553 only prohibits *unauthorized* receipt and in this case, Duermeier ordered the Event and TCI delivered it to his apartment for $44.95. Thus his receipt of the service was authorized. This does not mean that the videotaping of the Event or its later display were "ethical, fair, or even legal (if the boxing event was copyrighted, for example, its publication could possibly constitute infringement)." *That's Entertainment*, 1996 WL 514989 at * 2; *see also Kingvision Pay Per View*, 982 F.Supp. at 805 (if event shown by videotape on delayed basis, no cause of action under Communications Act). Rather, under the undisputed facts of this case defendants are not liable under § 605 or § 553.

**IT IS THEREFORE ORDERED** that defendants' *Motion For Summary Judgment* (Doc. # 34) filed September 29, 1998, be and hereby is **SUSTAINED.**

**IT IS FURTHER ORDERED** that plaintiff's *Motion For Partial Summary Judgment* (Doc. # 32) filed September 8, 1998, be and hereby is **OVERRULED.**

## MEMORANDUM AND ORDER

As previously noted, Kingvision Pay Per View, Ltd. ("Kingvision") alleges that defendants violated the Cable Communications Policy Act of 1984, codified as amended at 47 U.S.C. § 521 et seq., by sponsoring an unauthorized exhibition of a prize fight between Mike Tyson and Evander Holyfield. On October 9, 1998, the Court granted defendants' motion for summary judgment. Plaintiff now asks the Court to alter the resulting judgment dated October 13, 1998. *See Kingvision Pay Per View's Motion To Alter Judgment* (Doc. # 39) filed October 15, 1998. After considering plaintiff's arguments, the Court remains convinced that defendants are entitled to summary judgment and that plaintiff's motion to alter should be overruled.[1]

Kingvision correctly points out that the *Motion Of Defendants For Summary Judgment* (Doc. # 34) filed September 29, 1998, was not timely filed.[2] When the Court accepted defendants' untimely motion, it should have allowed Kingvision the full measure of allotted time to file any opposition. *See Amended Scheduling Order* (Doc. # 27) filed July 31, 1998. Instead, because all of the relevant issues in this case are legal rather than factual and the parties' summary judgment briefs identified all of the relevant issues, the Court treated the parties' briefs as cross motions for summary judgment and simultaneously took both motions under advisement. The Court regrets this error and grants plaintiff's request that the Court revisit the issue whether either party is entitled to summary judgment.

In some circumstances the Court would agree that because their motion was untimely filed and improperly served, defendants are not entitled to summary judgment. In this case, however, the Court had plaintiff's timely motion for partial summary judgment on the issue of liability, based on stipulated facts, when it prepared its memorandum and order. The question presented was whether (under uncontroverted facts) defendants had violated 47 U.S.C. § 553 and/or § 605. Even if defendants had not responded to plaintiff's summary judgment motion at all, the Court would have had to determine as a matter of law whether plaintiff was entitled to judgment. If the Court had concluded that plaintiff was not entitled to judgment on the issue of liability, the case would have proceeded to a trial which for legal reasons was predestined to result in judgment in favor of defendants on the issue of liability. The Court believed that the better course was to entertain defendants' motion, thus dispensing with a futile trial and placing the case in an appropriate posture for appeal.

On the merits, plaintiff argues that the Court should hold defendants liable under § 605, based on the reasoning of the Second Circuit in *International Cablevision, Inc. v. Sykes,* 75 F.3d 123 (2d Cir.1996). Plaintiff suggests that the Court rejected *Sykes* in part based on a "stray remark" in *Kingvision Pay Per View v. Owens,* 982 F.Supp. 803 (D.Kan.1997). But the Court did not cite *Owens* for more than its statement that "Courts generally have held that section 605 applies to interception or receipt of cable television signals 'before they begin to travel through the cable,' while section 553 applies to the 'interception or receipt of cable service transmissions at the point in the system that the transmission is carried by coaxial cable or wires.'" 982 F.Supp. at 805 (quoting *TCI Cablevision of New England v. Pier House Inn. Inc.,* 930 F.Supp. 727, 735 (D.R.I.1996)) (adopting rationale of *United States v. Norris,* and rejecting rationale of *Sykes* ). After reexamination of the relevant case law, the Court continues to find that the *Norris* reasoning is convincing.

Plaintiff next argues that defendants "intercepted" the Event under § 553, relying on *That's Entertainment, Inc., v. J.P.T., Inc.,* 843 F.Supp. 995 (D.Md.1993). In *J.P.T.,* an inn manager removed cable converters and

---

1. On October 21, 1998, defendants' counsel orally informed the court that defendants would not file a response to plaintiff's motion to alter judgment.

2. The Court's scheduling order directed that dispositive motions be filled by September 8, 1998, and defendants did not file their motion until September 29, 1998. Also, defendants apparently served their untimely motion by faxing it to Kingvision. This method of service is not proper under Fed. R. Civ. Pro. 5(a).

diverted the broadcast from its intended point of reception to the inn, where it was not authorized. The *J.P.T.* Court noted that the word "intercept," as used in the Act, "indicates the taking or seizure by the way or before arrival at the destined place." 843 F.Supp. at 999. This is precisely the definition this Court applied. Further, plaintiff asserts the Court relied on faulty reasoning from *That's Entertainment, Inc., v. Anciano's, Inc.*, 1996 WL 514989 at *2 (N.D.Ill. Sept.6, 1996), because that court stated that "if something makes it all the way to the destined place—be it a ship, a letter, or the transmission of a sporting event—then it has not been intercepted; its very arrival at the destination is proof of that." *Id.* at *1. But in *Anciano*, the court also stated that the cable service arrived at the mutually intended place of destination, and when it did so, it could not properly be deemed to be intercepted. This is a logical conclusion, despite any general statements the court may have made. Likewise, in this case, when the signal arrived at Duermeier's apartment as arranged with TCI, it hardly seems that he can be said to have intercepted it.[3]

Finally, plaintiff asserts that although Duermeier was individually authorized to receive the Event, his receipt was unauthorized because he was an agent of SDD. But the receipt in his own apartment was authorized. The subsequent "broadcast" of the tape was not authorized, but unlike § 605, § 553 only prohibits unauthorized interception or receipt of "communications service." It does not on its face prohibit videotaping and later publication of programs provided over a cable service. Absent controlling precedent that § 553 should be read more broadly, this Court will not broaden the statute.

**IT IS THEREFORE ORDERED** that *Kingvision Pay Per View's Motion To Alter*

---

3. Plaintiff points out that "[r]adio waves and cable communications that reach their ultimate destinations can still have been intercepted." See *Kingvision Pay Per View's Memorandum In Support Of Motion To Alter Judgment* (Doc. # 40) filed October 15, 1998. The Court agrees, in theory, but its theoretical agreement does not reach the facts of this case. By way of example, assume that before the point where the cable

*Judgment* (Doc. # 39) filed October 15, 1998, be and hereby is **OVERRULED.**

signal entered his apartment cable connection, Duermeier attached a device which sent the cable signal to the bar, so that the signal reached both its authorized destination (the apartment) and the unauthorized destination (the bar). In such a case the Court might agree that although the cable communications had reached their ultimate destination, they were still "intercepted."