**KINGVISION PAY–PER–VIEW, LTD., Plaintiff,**

v.

**SCOTT E'S PUB, INC. d/b/a Scott E's Pub, and Charles Spahn and Neal Altmann, individually, Defendants.**

No. 00–C–0763.

United States District Court, E.D. Wisconsin.

May 15, 2001.

John C. Scheller, Madison, WI, for Kingvision Pay–Per–View, Ltd.

Scott E's Pub, Inc., pro se.

Neal Altmann, pro se.

Charles Spahn, pro se.

## DECISION AND ORDER

ADELMAN, District Judge.

Plaintiff Kingvision Pay–Per–View, Ltd. filed this case against Scott E's Pub, Inc. d/b/a Scott E's Pub (I'll refer to the physical establishment as the "Pub"), Charles Spahn, and Neal Altmann, alleging that the defendant pub wrongfully intercepted the June 28, 1997 boxing match between Evander Holyfield and Mike Tyson without paying the requisite licensing fees. I granted default judgment against Scott E's Pub, Inc. back on September 29, 2000. At a status conference of February 14, 2001, Kingvision and Altmann agreed to Kingvision's voluntary dismissal of the case against Altmann. Spahn failed to appear at the February 14 status conference.

Currently pending is Kingvision's March 27 motion for summary judgment against Spahn—the final defendant. Spahn has not filed any opposition brief, so I assume that he does not dispute the truth of the facts or accuracy of the law presented by Kingvision.

## I. UNDISPUTED FACTS

The following facts come from the affidavits of Kingvision's attorney John C. Scheller and Kingvision's attorney-in-fact Skip Klauber, which were submitted with the motion for summary judgment, as well as the admissions made by Spahn.[1]

Kingvision owned the exclusive right to license to commercial establishments in Wisconsin the right to show the closed-circuit telecast of the June 28, 1997 Holyfield/Tyson fight and its undercard or preliminary bouts (the "Event"). Kingvision in fact licensed and broadcast the Event at closed circuit locations such as theaters, arenas, clubs, lounges, restaurants, and other commercial establishments in Wisconsin. These fights were only available to commercial establishments in Wisconsin through an agreement with Kingvision, which required payment of a licensing fee of $17.50 multiplied by the maximum fire code occupancy of each establishment. To safeguard against unauthorized interception or receipt of the Event, the satellite transmission was electronically coded or scrambled and was not available to or intended for the use of the general public.

Spahn is an owner and/or manager of the Pub and Scott E's Pub, Inc. All bartenders and the manager of the Pub and Scott E's Pub, Inc. acted on his behalf on June 28, 1997. Spahn was in the Pub on the night of June 28, 1997.

In advance of the Event Spahn advertised that it would be telecast in the Pub. Neither Spahn nor anyone else ordered the Event for the Pub from Kingvision or any other authorized party.

Spahn and Scott E's Pub, Inc. showed the Event in the Pub on television monitors on June 28, 1997; the Pub's customers watched the Event that night. An investigator entered the Pub at approximately 10:23 p.m. on June 28, 1997, and saw the Event being shown on five television monitors. She counted approximately fifty-four people in the Pub at that time.

---

1. According to a certificate of service presented by Kingvision, it served requests for admission on Spahn at the address Spahn gave in his complaint. The requests were not returned by the postal service. Spahn never served Kingvision with a response. Therefore, the matters were admitted by Spahn pursuant to Fed.R.Civ.P. 36(a) ("The matter is admitted unless, within 30 days after service of the request ... the party to whom the request is directed serves upon the party requesting the admission a written answer or objection addressed to the matter, signed by the party ...."). Any matter so admitted is conclusively established. Fed.R.Civ.P. 36(b).

The Event was received and shown in the Pub because its agents employed some means to intercept and decode or otherwise receive the Event. The Event was received in the Pub because residential cable service was diverted into the Pub and because a decoder was used to intercept and decode the signal.[2]

The Pub charged its customers a cover charge that night. The television monitors in the Pub existed for the viewing pleasure of the Pub's customers.

## II. SUMMARY JUDGMENT STANDARD

Summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A "material" factual dispute is one that is outcome-determinative under governing law. *Contreras v. City of Chicago*, 119 F.3d 1286, 1291 (7th Cir.1997). A "genuine" issue of fact requires evidence that if believed by a jury would actually support a verdict in the nonmovant's favor. Fed. R.Civ.P. 56(e); *Anderson v. Liberty Lobby*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

The moving party has the initial burden of demonstrating that it is entitled to summary judgment. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. Once this burden is met, the nonmoving party must designate specific facts to defend each element of the cause of action, showing that there is a genuine issue for trial. *Id.* at 322–24, 106 S.Ct. 2548.

## III. DISCUSSION

 In regard to satellite transmissions,

[n]o person not being authorized by the sender shall intercept any radio communication and divulge or publish the existence, contents, substance, purport, effect, or meaning of such intercepted communication to any person. No person not being entitled thereto shall receive or assist in receiving any interstate ... communication by radio and use such communication (or any information therein contained) for his own benefit or for the benefit of another not entitled thereto.

47 U.S.C. § 605(a). This provision applies to encrypted satellite transmissions. *Kingvision Pay Per View, Ltd. v. Williams*, 1 F.Supp.2d 1481, 1484 (S.D.Ga. 1998); *see* § 605(b). Any person aggrieved by a violation of § 605(a) has a private right of action enforceable in federal court. § 605(e)(3)(A). A party whose rights have been violated under § 605 can elect either actual damages or statutory damages. § 605(e)(3)(C)(i). A court may award statutory damages of between $1,000 and $10,000 per violation, "as the court considers just." § 605(e)(3)(C)(i)(II). If the violations were committed "willfully and for purposes of direct or indirect commercial advantage or private financial gain," the court in its discretion may increase the award of statutory damages by up to $100,000 per violation. § 605(e)(3)(C)(iii). Section 605 also provides that a court shall award a plaintiff reasonable attorneys' fees. § 605(e)(3)(B)(iii). A court has great discretion in awarding statutory damages under § 605, and a defendant does not have a right to a jury or bench trial as to the award of statutory damages, provided that

---

**2.** Perhaps in fact the Pub used only one of these methods, but for purposes of this litigation Spahn has admitted that both methods occurred.

the parties have been given an opportunity to present supporting evidence to the district court. *Cable/Home Communication Corp. v. Network Prods., Inc.*, 902 F.2d 829, 853 (11th Cir.1990) (discussing statutory damages under both § 605 and copyright laws).

■■■ As for cable transmissions, "[n]o person shall intercept or receive or assist in intercepting or receiving any communications service offered over a cable system, unless specifically authorized to do so by a cable operator." 47 U.S.C. § 553(a)(1). As with § 605(a), any person aggrieved by a violation of § 553(a)(1) has a private right of action in federal court. § 553(c). The court may award either actual damages or statutory damages. § 553(c)(3)(A). The latter may run from between $250 to $10,000 per violation. § 553(c)(3)(A)(ii). The statutory damages award against any person violating § 553(a)(1) "willfully and for purposes of commercial advantage or private financial gain" may be increased by up to $50,000. § 553(c)(3)(B). Section 553 also provides that the court may award a plaintiff reasonable attorneys' fees. § 553(c)(2)(C).

"Willful" as used in these statutes means a "disregard for the governing statute and an indifference for its requirements." *ON/TV v. Julien*, 763 F.2d 839, 844 (7th Cir.1985) (internal quotation marks omitted).

Thus, 47 U.S.C. § 605 governs the interception of programming as it travels through the air, while 47 U.S.C. § 553 governs the interception of cable television programming traveling over a cable network. *United States v. Norris*, 88 F.3d 462, 468–69 (7th Cir.1996); *see* 47 U.S.C. §§ 553, 605. The statutes have been used by the owners of exclusive rights in closed-circuit boxing matches to recover damages from the owners of establishments that have broadcast such matches without purchasing the right to do so. *See, e.g.,*

*Kingvision Pay Per View, Ltd.*, 1 F.Supp.2d at 1482–85; *That's Entm't, Inc. v. J.P.T., Inc.*, 843 F.Supp. 995 (D.Md. 1993); *Don King Prods./Kingvision v. Lovato*, 911 F.Supp. 419 (N.D.Cal.1995).

■■■ The undisputed evidence shows that Spahn or agents acting on his behalf intercepted and rebroadcast the Event in violation of § 605 and diverted a cable communication in violation of § 553. Therefore, the court finds that summary judgment must be granted as to liability.

Further, the undisputed evidence shows that the interception and diversion of signals was willful—that Spahn and the Pub could not have intercepted the Event innocently or by mistake. They advertised the Event before it took place. They did not order or pay for receiving the broadcast, disregarding the existence of §§ 553 and 605. No rational jury could fail to find that a diversion of residential cable services or the use of a decoder required an intentional act by Spahn or his agents. As one district court put it when recently finding willfulness under these statutes: "Signals do not descramble spontaneously, nor do television sets connect themselves to cable distribution systems." *Time Warner Cable v. Googies Luncheonette, Inc.*, 77 F.Supp.2d 485, 490 (S.D.N.Y.1999). Because the Event was rebroadcast to customers of the Pub, who were charged a cover charge, and Spahn owned the Pub and Scott E's Pub, Inc., Spahn's actions were for purposes of direct or indirect commercial advantage.

■■■ As to damages, Kingvision has elected to pursue statutory damages under § 605 and has persuaded me that statutory damages are appropriate under § 553. According to Kingvision, the court should assume that the Pub held about 150 customers maximum, which would lead to a license fee (if Spahn and the Pub had properly ordered the Event) of $2,625.

This capacity appears likely, as the investigator who saw the Event at the Pub counted fifty-four persons in the Pub at one time on June 28, 1997.

That amount is merely used as a base for arriving at a statutory damage amount, as Spahn should not be allowed to pay merely the amount he would have if he had properly ordered the Event. I should consider the possible lost profits to Kingvision if the Pub had purchased the Event properly, as well as the damage Kingvision has likely suffered by the loss of goodwill from other establishments that purchased the Event properly and lost customers to the Pub or believe that Kingvision misled them about who their competition for broadcasting the Event was that night. A deterrence factor should be considered as well. *Cable/Home Communication Corp.*, 902 F.2d at 852 (discussing statutory damages under both § 605 and copyright laws); *Cablevision Sys. New York City Corp. v. Lokshin*, 980 F.Supp. 107, 109–10 (E.D.N.Y.1997) ("Because Section 553(a)(1) was specifically enacted to address the 'major problem' of theft of cable services, it seems especially appropriate in this case to go beyond an award of maximum statutory damages in order to deter the defendant and others from future theft of cable services." (citations omitted)). And the Pub did improperly profit from the Event, as it received cover charges that night and, it can be assumed, sold beverages to its customers at a profit. And finally, Spahn has admitted to violations of *both* statutes.

Some courts have assessed statutory damages using as a yardstick the number of patrons in the establishment viewing the show. *See, e.g., Googies Luncheonette, Inc.*, 77 F.Supp.2d at 489 (listing cases); *Time Warner Cable v. Taco Rapido Rest.*, 988 F.Supp. 107, 111 (E.D.N.Y.1997) (same). Some courts have awarded a flat sum for each violation. *See, e.g., Googies Luncheonette, Inc.*, 77 F.Supp.2d at 489–90

(listing cases); *Taco Rapido Rest.*, 988 F.Supp. at 111 (same). A multiplier has been used in cases of willful violations. *See, e.g., Googies Luncheonette, Inc.*, 77 F.Supp.2d at 491 (recommending for willful violation an additional three times the base statutory damages award for one defendant, an additional four times the award for another defendant, and an additional eight times the award for a third defendant); *Cablevision Sys. Corp. v. Maxie's N. Shore Deli Corp.*, No. CV 88 2834(ASC), 1991 WL 58350, *2 (E.D.N.Y. 1991) (awarding an additional amount for willful violation in the amount of five times the initial statutory damages award).

In *Googies Luncheonette, Inc.* the court awarded the additional three times the base award against a defendant bar that was legally connected to the cable network but had not ordered the particular pay-per-view boxing match it broadcast to its customers. The court found that the defendant would be reasonably deterred from future violations by that amount. *Googies Luncheonette, Inc.*, 77 F.Supp.2d at 491. An award of four times the base amount was made against a defendant bar that was not authorized to receive any signals at all from the plaintiff; four times the base award reflected the more aggravated nature of the offense. *Id.* There was no evidence that either of these defendants charged a cover charge. *Id.* at 490. A third defendant bar with a history of unlawfully appropriating property had an additional eight times the base award added on for its willful violation of § 605. *Id.* at 491.

In *Taco Rapido Restaurant*, the court awarded a base amount of statutory damages based on the number of occupants watching an improperly broadcast boxing match. The court added $5,000 in willful damages, finding this amount to be deserved even though the restaurant did not

advertize the boxing match to entice customers, did not charge a cover fee, and showed the boxing match on only one television. *Taco Rapido Rest.*, 988 F.Supp. at 111–12.

In this case, a statutory award based on the number of patrons in the Pub would not adequately compensate Kingvision, as the fees it charged commercial customers properly ordering the service were based on maximum fire code occupancy. I agree that using an estimate of 150 maximum occupancy times the rate of $17.50 Kingvision charged its regular customers—thus $2,625—is an appropriate start, but that as the initial statutory damages award Kingvision should pay twice that— $5,250—because it did not obtain the Event legally.

Further, I believe that an *additional* amount of five times the base amount is appropriate in this case. Spahn committed a more egregious offense than two of the defendants in *Googies Luncheonette, Inc.* (whose multipliers were three and four) or the defendant in *Taco Rapido Restaurant*, as he advertised the Event, charged a cover charge, and showed the Event on *five* television monitors. Therefore, an additional $13,125 will be added as statutory damages, for a total of $18,375.

I previously granted default judgment against the Pub for $18,375 in statutory damages. Spahn himself, by virtue of his silence in the face of Kingvision's motion, does not dispute that he should be responsible for at least the amount suggested in the motion for summary judgment: $18,375. For a willful act the court could award up to $110,000 for a § 605 violation and up to $60,000 for a § 553 violation, so the amounts I am awarding are just and reasonable.

Further, Kingvision requests $200 for attorneys' fees, which I will award, as the preparation of pleadings and the summary judgment motion had to cost at least that

amount. Therefore, the total judgment against Spahn shall be $18,575.

**THEREFORE, IT IS ORDERED** that Kingvision's motion for summary judgment is **GRANTED.**

**IT IS ORDERED** that the clerk enter judgment in favor of Kingvision against Charles Spahn in the amount of $18,575. It appears that no Fed.R.Civ.P. 54(b) judgment was entered against the Pub after default judgment was granted, therefore, **IT IS ORDERED** that the judgment also include Kingvision's judgment against the Pub in the amount of $18,575. Finally, the judgment should reflect the dismissal of the claim against Altmann as well.